John P. Davis
Patrick M. Sullivan
POORE, ROTH & ROBINSON, P.C.
1341 Harrison Avenue
P.O. Box 2000
Butte, MT 59702
(406) 497-1200
jpd@prrlaw.com
pss@prrlaw.com

Jonathan W. Rauchway (*PHV pending*)
Shannon Wells Stevenson (*PHV pending*)
Mark E. Champoux  (*PHV pending*)
James R. Henderson
DAVIS GRAHAM & STUBBS LLP
1550 Seventeenth Street, Suite 500
Denver, Colorado 80202
(303) 892-9400
jon.rauchway@dgslaw.com
shannon.stevenson@dgslaw.com
mark.champoux@dgslaw.com
jim.henderson@dgslaw.com

*Attorneys for Plaintiff Atlantic Richfield Company*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION**

**FILED**

DEC 22 2015

Clerk, U.S. Courts
District Of Montana
Butte Division

| | |
|---|---|
| ATLANTIC RICHFIELD COMPANY, a Delaware corporation, | Cause No. CV-15-83-BU-Bmm-JCL |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| GREGORY A. CHRISTIAN; MICHELLE D. CHRISTIAN; ROSEMARY CHOQUETTE; DUANE N. COLWELL; SHIRLEY A. COLWELL; FRANKLIN J. COONEY; VICKI COONEY; GEORGE COWARD; SHIRLEY COWARD; JACK E. DATRES; SHEILA DORSCHER; VIOLA DUFFY; BRUCE DUXBURY; JOYCE DUXBURY; BILL FIELD; CHRIS FIELD; ANDREW GRESS AND | |

ORIGINAL

FRANK GRESS AS CO-PERSONAL
REPRESENTATIVES OF THE
ESTATE OF JAMES GRESS;
CHARLES GUSTAFSON; MICHAEL
HENDRICKSON; PATRICE
HOOLAHAN; SHAUN HOOLAHAN;
ED JONES; RUTH JONES;
BARBARA KELSEY; MYRTLE
KOEPPLIN; BRENDA KRATTIGER;
DOUG KRATTIGER; JULIE
LATRAY; LEONARD MANN;
VALERIE MANN; KRISTY MCKAY;
RUSS MCKAY; BRYCE MEYER;
MILDRED MEYER; JUDY
MINNEHAN; TED MINNEHAN;
DIANE MORSE; RICHARD MORSE;
KAREN MULCAHY; PATRICK
MULCAHY; NANCY MYERS;
SERGE MYERS; LESLIE NELSON;
RON NELSON; JANE NEWELL;
JOHN NEWELL; GEORGE NILAND;
LAURIE NILAND; DAVID
OSTROM; ROSE ANN OSTROM;
JUDY PETERS; TAMMY PETERS;
ROBERT PHILLIPS; TONY
PHILLIPS; CAROL POWERS;
WILLIAM D. POWERS; GARY
RAASAKKA; MALISSA
RAASAKKA; ALEX REID; KENT
REISENAUER; PETE REISENAUER;
SUE REISENAUER; LARRY RUPP;
JOHN A. RUSINSKI; KATHRYN
RUSINSKI; EMILY RUSS; SCOTT
RUSS; CARL RYAN; PENNY RYAN;
RICH SALLE; DIANE SALLE; DALE
SCHAFER; DAVID D. SCHLOSSER;

2

ILONA M. SCHLOSSER; MICHAEL
SEVALSTAD; JIM SHAFFORD;
ROSEMARY SILZLY; ANTHONY
SOLAN; KEVIN SORUM; DON
SPARKS; VICKIE SPEHAR; ZANE
SPEHAR; CARA SVENDSEN;
CARON SVENDSEN; JAMES H.
SVENDSEN, SR.; JAMES
SVENDSEN, JR.; DOUG VIOLETTE;
ESTER VIOLETTE; CAROL
WALROD; CHARLES WALROD;
DARLENE WILLEY; KEN YATES;
SHARON YATES; LINDA EGGEN
AS PERSONAL REPRESENTATIVE
OF THE ESTATE OF WILLIAM
YELSA AND AS GUARDIAN OF
MAURINE YELSA; DAVID
ZIMMER; and TONI ZIMMER,

   Defendants.

COMES NOW Plaintiff Atlantic Richfield Company ("Atlantic Richfield"),

and for its Complaint against Defendants, alleges as follows:

## NATURE OF THE ACTION

1.     Atlantic Richfield brings this action for declaratory and injunctive

relief concerning the common-law claim for "restoration damages" asserted by

Defendants in Montana state court.[1]  Defendants' restoration claim challenges the

remedy that the United States Environmental Protection Agency ("EPA") has

---

[1] *Christian, et al. v. Atl. Richfield Co.*, No. DV-08-173 (Second Jud. Dist. Ct., Silver Bow Cty.).

3

selected for the Anaconda Smelter Superfund Site (the "Site") by seeking an order

from the state court allowing Defendants to perform "restoration" actions that will

interfere with the environmental remedies selected for the Site.  The

Comprehensive Environmental Response, Compensation, and Liability Act

("CERCLA"), 42 U.S.C. §§ 9601-9675, provides for exclusive jurisdiction in

federal court for any challenge to a CERCLA remedy, and bars such challenges in

all instances other than those expressly allowed by the statute.  42 U.S.C.

§ 9613(b), (h).

2.     Defendants have asserted multiple claims in their state court lawsuit

based on alleged environmental contamination on properties within the boundaries

of the Anaconda Smelter Superfund Site.  This federal action concerns Defendants'

restoration claim only, not their claims for diminution in property value, loss of use

and enjoyment, or other relief.

3.     EPA has supervised the cleanup of the Site under its CERCLA

authority for over thirty years.  During this period, EPA has carefully selected

appropriate cleanup standards and remedies under CERCLA, and issued orders

requiring Atlantic Richfield to implement those remedies.  In compliance with

those orders, Atlantic Richfield has implemented and is continuing to implement

EPA's selected cleanup standards and remedies, including those which EPA

4

selected for the properties that are the subject of Defendants' claims in the state court lawsuit.

4.     CERCLA does not prohibit all common-law claims for property damages, but it does bar state-law claims that challenge EPA's chosen remedy at a Superfund site.  The reason for this prohibition is apparent:  CERCLA is designed to facilitate orderly, efficient, and effective environmental cleanups overseen by federal and state regulators with expertise in such matters.  Permitting concurrent private-party actions that are inconsistent with an EPA-selected remedy would interfere with the remediation process and potentially exacerbate the contamination problem.

5.     Defendants' restoration claim is precisely the kind of improper attack on EPA's selected remedy that CERCLA forbids.  Defendants criticize EPA's regulatory process and selection of environmental remedies, and then request a finding from the state court that their "restoration" actions can and should be performed at the Site, even where those actions are inconsistent and would interfere with EPA's selected remedies.  Through their restoration claim, Defendants seek to circumvent CERCLA's statutory and regulatory processes for the selection, construction, and long-term maintenance of EPA's selected remedies in order to perform "restoration" actions at the Site that meet their own subjective

5

cleanup standards.  Such a challenge to an ongoing Superfund cleanup is

prohibited by CERCLA § 113(h), 42 U.S.C. § 9613(h).

6. Accordingly, Atlantic Richfield seeks (1) a declaration that

Defendants' restoration plan is an impermissible challenge to EPA's approved

remedy for the Site, and (2) an order enjoining Defendants from performing their

proposed "restoration" actions at the Anaconda Smelter Superfund Site.

## PARTIES, JURISDICTION, AND VENUE

7. Atlantic Richfield is incorporated under the laws of the State of

Delaware, with its principal place of business in the State of Texas.

8. On information and belief, all Defendants except Emily Russ, Scott

Russ, and Anthony Solan are residents of the State of Montana.  Emily Russ and

Scott Russ are residents of the State of Georgia.  Anthony Solan is a resident of the

State of Washington.

9. Under 42 U.S.C. § 9613(b), "the United States district courts shall

have exclusive original jurisdiction over all controversies arising under

[CERCLA]."  The Court therefore has subject-matter jurisdiction under 28 U.S.C.

§ 1331.

10. In addition, the Court has subject matter jurisdiction under 28 U.S.C.

§ 1332 based on diversity of citizenship because Atlantic Richfield and Defendants

6

are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

11.    The Court may grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

12.    The Court has personal jurisdiction over Defendants because they either live in or own real property within Deer Lodge County, Montana; Atlantic Richfield's claims arise from Defendants' acts that occurred in Deer Lodge County and Silver Bow County, Montana; and the properties that are the subject of this action are located in Deer Lodge County, Montana.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), 42 U.S.C. § 9613(b), Local Rule 3.2 of the Local Rules of Procedure of the United States District Court for the District of Montana, and Title 25, Chapter 2, Parts 122 and 123 of the Montana Code because most of Defendants are residents of Deer Lodge County, Montana, and all of the properties that are the subject of this action are located in Deer Lodge County, Montana.

## GENERAL ALLEGATIONS

### I.    CERCLA provides a comprehensive framework for environmental cleanup at sites where EPA exercises its statutory authority.

14.    CERCLA, also known as the "Superfund" law, was enacted in 1980 to promote the cleanup of contaminated sites around the country. "As its name

7

implies, CERCLA is a comprehensive statute that grants the President broad power to command government agencies and private parties to clean up hazardous waste sites." *Key Tronic Corp. v. United States*, 511 U.S. 809, 814 (1994).

15.     CERCLA "[s]ections 104 and 106 provide the framework for federal abatement and enforcement actions that the President, [or] the EPA as his delegated agent ... initiates." *Id.* CERCLA empowers EPA to: (1) perform cleanup actions itself; (2) order responsible parties to perform cleanup actions under its supervision; or (3) enter into agreements with potentially responsible parties to perform specified cleanup actions. *See* 42 U.S.C. §§ 9604, 9606.

16.     EPA implements CERCLA's requirements through federal regulations known as the National Contingency Plan ("NCP"), 40 C.F.R. § 300. The NCP establishes the regulatory process EPA follows to compare remedial alternatives and to select the appropriate response action.

17.     As part of the NCP, the President maintains a list of "national priorities among the known releases or threatened releases throughout the United States." 42 U.S.C. § 9605(a)(8)(B). This is known as the National Priorities List ("NPL"). 40 C.F.R. § 300.425(b). The NPL "is the EPA's inventory of the most seriously contaminated hazardous waste sites in the United States." *Intel Corp. v. Hartford Acc. & Indem. Co.*, 952 F.2d 1551, 1554 n.2 (9th Cir. 1991).

8

18.     When EPA proposes to add a site to the NPL, it is required to publish a notice in the Federal Register and to provide an opportunity for the public to comment on the proposal.  40 C.F.R. § 300.425(d)(5).  EPA also is required to involve states in the process by providing opportunities for review, consultation, or concurrence with EPA's findings and decisions.  *Id.* § 300.515(c).

19.     After the formal comment period, EPA makes the final determination of whether a site should be added to the NPL.  "Adding a site to the National Priorities List designates it as a Superfund site."  *Durfey v. E.I. DuPont de Nemours & Co.*, 59 F.3d 121, 123 n.2 (9th Cir. 1995).

20.     After a site is added to the NPL, EPA is required to conduct a remedial investigation and feasibility study ("RI/FS").  *United States v. Asarco Inc.*, 430 F.3d 972, 976 (9th Cir. 2005).  During the RI/FS, EPA "assess[es] site conditions and evaluate[s] alternatives," and then selects a remedy that will "eliminate, reduce, or control risks to human health and the environment." 40 C.F.R. § 300.430(a)(1)-(2).

21.     After the RI/FS, EPA presents its preferred remedy to the public for review and comment.  40 C.F.R. § 300.430(f)(1)(ii).  The public comment period is required to include, at a minimum:

(a)     Notice and a brief analysis of the proposed plan in a major local newspaper of general circulation;

(b)     Availability of the proposed plan in the administrative record;

(c)     A reasonable opportunity for submission of written and oral comments on the proposed plan; and

(d)     A public meeting regarding the proposed plan.

*Id.* § 300.430(f)(3)(i). EPA also is required to prepare a written summary of significant comments, criticisms, and new relevant information submitted during the public comment period, along with its responses to public comments. *Id.*

22.     After the public comment period, EPA selects a final remedy and memorializes it in a public document called a Record of Decision ("ROD"). *Id.* § 300.430(f)(3)-(6).

23.     Although CERCLA provides ample opportunity for public comment on EPA's remedial decisions, the statute strictly circumscribes the ways in which those decisions may be challenged. "Congress concluded that the need for [EPA] action was paramount, and that peripheral disputes, including those over what measures actually are necessary to clean-up the site and remove the hazard, may not be brought while the cleanup is in process." *McClellan Ecological Seepage Situation v. Perry*, 47 F.3d 325, 329 (9th Cir. 1995).

10

## II.   CERCLA broadly prohibits challenges to EPA's cleanup decisions.

24.    "To ensure that the cleanup of contaminated sites will not be slowed or halted by litigation, Congress enacted section 113(h) in its 1986 amendments to CERCLA." *Razore v. Tulalip Tribes*, 66 F.3d 236, 239 (9th Cir. 1995). Section 113(h) prohibits all challenges to an EPA cleanup except for those specifically authorized.  The statute provides in pertinent part:

> No Federal court shall have jurisdiction under Federal law … or under State law … to review any challenges to removal or remedial action selected under section 9604 of this title, or to review any order issued under section 9606(a) of this title, in any action except one of the following:
>
>> (1) An action under section 9607 … to recover response costs or [natural resource] damages or contribution [for response costs and natural resource damages].
>>
>> (2)  An action to enforce an order issued under section 9606(a) ….
>>
>> (3)  An action for reimbursement [of EPA costs] under section 9606(b)(2) ….
>>
>> (4) An action under section 9659 of this title (relating to citizen suits) ….
>>
>> (5) An action under section 9606 of this title in which the United States has moved to compel a remediation action.

42 U.S.C. § 9613(h)(1)-(5).

25.    Defendants' claim for restoration damages does not fit within any of these exceptions.

11

26.     Section 113(h) is "clear and unequivocal," and "amounts to a blunt

withdrawal" of jurisdiction for any challenges to a CERCLA cleanup that fall

outside the five statutory exceptions. *McClellan*, 47 F.3d at 328.  Because federal

courts have exclusive jurisdiction over CERCLA claims, the statute prohibits all

challenges to CERCLA cleanups that are brought in state courts. *Fort Ord Toxics*

*Project, Inc. v. Cal. EPA*, 189 F.3d 828, 832 (9th Cir. 1999).

27.     CERCLA defines a removal action as "the cleanup or removal of

released hazardous substances from the environment," including "such actions as

may be necessary to monitor, assess, and evaluate the release or threat of release of

hazardous substances."  42 U.S.C. § 9601(23).  When EPA begins an RI/FS, it has

initiated a removal action within the meaning of section 113(h) of CERCLA. *See*

*Razore*, 66 F.3d at 239.

28.     Remedial actions include "those actions consistent with permanent

remedy taken instead of or in addition to removal action in the event of a release or

threatened release of a hazardous substance."  42 U.S.C. § 9601(24).

29.     "An action constitutes a challenge to a CERCLA cleanup 'if it is

related to the goals of the cleanup.'" *ARCO Envtl. Remediation, L.L.C. v. Dep't of*

*Health & Envtl. Quality of Mont.*, 213 F.3d 1108, 1115 (9th Cir. 2000) (quoting

*Razore,* 66 F.3d at 239).  "Challenges" include actions in which a party seeks "to

dictate specific remedial actions; to postpone the cleanup; to impose additional reporting requirements on the cleanup; or to ... alter the method and order of cleanup." *Id.* (citations omitted).  Likewise, a claim challenges a CERCLA cleanup if it "interfere[s] with the remedial actions selected under CERCLA Section 104," or "seeks to improve on the CERCLA cleanup" selected by EPA. *McClellan,* 47 F.3d at 330; *see also Pakootas v. Teck Cominco Metals, Ltd.,* 646 F.3d 1214, 1220 (9th Cir. 2011) ("[W]here the EPA works out a plan, and a citizen suit seeks to improve on the CERCLA cleanup because it 'wants more,' that constitutes interference.  Such a claim would second-guess the parties' determination and thus interfere with the remedial actions selected ....").

30.    Section 113(h) bars remedies sought under state law that directly or indirectly challenge a CERCLA remedy. *Fort Ord,* 189 F.3d at 832 (Section 113 applies to "any 'challenge' to a CERCLA cleanup," including those brought under state law.).

## III.   Defendants' properties are within a federal Superfund site and are part of an ongoing CERCLA cleanup.

31.    Defendants reside or own property in Deer Lodge County, primarily in the towns of Opportunity and Crackerville, outside of Anaconda.

13

32.    Defendants' properties are situated just a few miles from the former Anaconda Smelter.  For nearly 100 years, the Smelter was operated by The Anaconda Company and its predecessors to produce metallic copper and other metals.

33.    The smelter processed ores that contained arsenic, lead, and other metals, in addition to the desired copper.  Remedial investigations of the area show that during the smelting process, some of that arsenic and lead was emitted from the Smelter stack and settled on the surrounding land.

34.    In 1977, Atlantic Richfield purchased The Anaconda Company.  In 1980, the Smelter closed.  In 1981, there was a merger between The Anaconda Company and Atlantic Richfield Company, leaving Atlantic Richfield as the surviving entity.

35.    The Anaconda Smelter and surrounding area was added to the National Priorities List ("NPL") as a Superfund site in 1983.  *See* 48 Fed. Reg. 40,658 (Sept. 8, 1983).  All of the properties that are the subject of Defendants' restoration claim are within the boundaries of the Anaconda Smelter Superfund Site.

36.    EPA has actively managed the Anaconda Smelter Superfund Site for over thirty years.  During that time, EPA has selected and refined site-specific

remedies after years of study and public comment, and in accordance with CERCLA's requirements for establishing cleanup standards and selecting appropriate response actions to achieve those standards.

37.     EPA and Atlantic Richfield entered into an agreement to begin investigating the Site in 1982. Since that time, Atlantic Richfield has worked cooperatively with EPA, as well as state and local agencies, spending millions of dollars to conduct environmental investigations and to complete extensive cleanup projects according to EPA's remedy decisions.

38.     EPA issued its first administrative order to Atlantic Richfield in 1984 requiring the company to perform a site-wide RI/FS. Atlantic Richfield completed this initial RI/FS in 1987.

39.     EPA has divided the Site into five major sections called Operable Units ("OUs"), each of which relates to a different medium or geographic area for cleanup. Each OU has its own ROD describing the remedy that EPA selected.

40.     Two of the OUs—Community Soils ("CS") and Anaconda Regional Water, Waste, and Soils ("ARWWS")—directly affect Defendants' properties.

41.     The CSOU ROD addresses residential soils, principally residential yards. Defendants' residential yards are subject to the CSOU ROD.

15

42.     The ARWWS OU ROD addresses surface water, groundwater, non-residential soils, and all other remaining issues at the Site not expressly encompassed within other OUs. Defendants' domestic wells and pasture properties are subject to the ARWWS OU ROD.

43.     Under an administrative order issued in 1988, EPA required Atlantic Richfield to conduct separate RI/FSs for both the CSOU and the ARWWS OU. Atlantic Richfield completed those RI/FSs in 1996.

44.     Atlantic Richfield, the Montana Department of Environmental Quality, and EPA involved the public in the decision-making process by advertising public comment periods and holding numerous public meetings to gather community input about cleanup decisions. Atlantic Richfield and EPA also created a document repository in Anaconda that is open to the public and contains numerous documents from the EPA administrative file for the Site.

45.     EPA issued its CSOU ROD in 1996, and amended it in 2013. EPA issued its ARWWS OU ROD in 1998, and amended it in 2011. Atlantic Richfield has performed significant remedial work under the terms of these RODs and EPA's orders requiring Atlantic Richfield to implement the remedies that EPA selected in them.

16

### A.   EPA's Community Soils Record of Decision (CSOU ROD).

46.   The CSOU ROD requires testing of residential yards in certain areas and provides for cleanup of any yards exceeding the EPA-established action level of 250 parts per million ("ppm") of arsenic (measured on a yard-weighted-average basis).  EPA established this action level after it conducted an extensive health-based assessment that considered the nature and characteristics of arsenic at the Site.  EPA considers this action level to be fully protective of human health and the environment.

47.   Any residential yard that exceeds the EPA-established action level for arsenic must be remediated by removing soil up to a depth of 18 inches below the surface, and by replacing it with clean soil and sod.  Pursuant to the CSOU ROD, Atlantic Richfield has sampled approximately 1,740 residential yards, and has remediated approximately 350 yards.

48.   Because EPA determined that contamination in the communities where Defendants live (Opportunity and Crackerville) did not present a risk to human health or the environment sufficient to warrant mandatory testing, the CSOU ROD requires testing of soils in these communities only if the homeowner requests it.

49.    In response to homeowner requests—including from some Defendants—Atlantic Richfield tested a number of yards in Opportunity and Crackerville. Based on those tests, Atlantic Richfield remediated two of Defendants' yards, and has pending offers to remediate additional properties belonging to Defendants.

50.    EPA amended the CSOU ROD in September 2013. The amendment process involved extensive community involvement, including public meetings, mailing copies of the proposed plan to hundreds of community residents, publication of a fact sheet summarizing the proposed changes in a local newspaper, and a three-month public comment period.

51.    The amended CSOU ROD, which was supported by both the State of Montana and Anaconda-Deer Lodge County, added a requirement for remediation of residential yards with lead concentrations above 400 ppm, added cleanup levels for arsenic and lead in accessible interior dust, and expanded institutional controls.

52.    EPA ordered Atlantic Richfield to perform the work specified by the CSOU ROD and amendments. All of the work Atlantic Richfield has performed under the CSOU ROD and amendments has been supervised and approved by EPA.

**B.      EPA's Anaconda Regional Water, Waste & Soils Record of Decision (ARWWS OU ROD).**

53.      Under the ARWWS OU ROD, Atlantic Richfield has implemented remedies in vast areas that formerly were used for smelting and related industrial operations, including former disposal ponds associated with the smelting facility, as well as other areas that are used for recreational or agricultural purposes, such as portions of Warm Springs Creek.

54.      The soils component of the ARWWS OU ROD established an action level of 1,000 ppm of arsenic in soil for recreational or agricultural areas, including pastures. EPA established this action level after it conducted an extensive health-based assessment that considered the nature and characteristics of arsenic at the Site. EPA considers this action level to be fully protective of human health and the environment.

55.      Any agricultural or recreational area that exceeds the EPA-established action level must be remediated to EPA's specifications, which ordinarily includes a combination of soil amendment, tilling, and revegetation. None of Defendants' pasture properties exceed the EPA action level for agricultural land.

56. The groundwater component of the ARWWS OU ROD requires testing of residential wells and identifies remedies where needed to ensure a safe drinking water supply to all households.

57. Per the terms of the ARWWS OU ROD, Atlantic Richfield has tested the domestic wells of Opportunity and Crackerville residents, including Defendants. Ten parts per billion ("ppb") is the federal and state drinking water standard for arsenic. EPA considers this action level to be fully protective of human health and the environment.

58. Under the ROD, if water in a domestic well tests under 5 ppb of arsenic, no further action is taken. If water tests between 5 and 10 ppb of arsenic, the well is monitored annually for three years to make sure it does not exceed 10 ppb. If water in a domestic well tests over 10 ppb of arsenic, response actions are required, which include replacing the well or installing a treatment system for water from that well. Bottled water is provided to the homeowner in the interim until the response action is completed.

59. Only two wells on Defendants' properties tested over 10 ppb of arsenic. Atlantic Richfield replaced both wells.

60.    EPA ordered Atlantic Richfield to perform the work specified by the

ARWWS OU ROD. All of the work Atlantic Richfield has performed under the

ARWWS OU ROD has been supervised and approved by EPA.

**C.    Atlantic Richfield continues to implement EPA's CSOU and ARWWS OU remedies.**

61.    Cleanup work under both the CSOU ROD and the ARWWS OU ROD

is ongoing, including work involving Defendants' properties.

62.    EPA recently issued a CSOU Unilateral Administrative Order

("UAO," attached as Exhibit A) pursuant to CERCLA § 106, 42 U.S.C. § 9606.

The UAO requires Atlantic Richfield to conduct additional cleanup work set forth

in the Residential Soils/Dust Remedial Action Work Plan/Final Design Report

approved by EPA in August 2015. Some of this work will involve Defendants'

properties.

63.    Atlantic Richfield, EPA, and other stakeholders are currently

negotiating a final site-wide consent decree that will encompass all remaining

remedies and related work to be conducted at the Site. Some of the work required

under this consent decree will involve Defendants' properties. When the terms of

this consent decree are finalized, it will be lodged with the United States District

Court in *United States v. Atlantic Richfield Co.*, Case No. 89-cv-00039-BU-SEH

(D. Mont.), and the United States and Atlantic Richfield will request that the Court

enter it as a final judgment that will be binding on all parties.

## IV.   Defendants' restoration plan challenges the remedies EPA selected for the Site.

64.    Defendants filed a lawsuit in state court alleging that Atlantic

Richfield and its predecessors damaged their property while conducting "a milling

and smelting operation located near the towns of Anaconda and Opportunity …

from 1884 to 1980." Third. Am. Compl. (attached as Exhibit B) ¶ 11.

65.    Through their state court lawsuit, Defendants seek to recover, among

other things, "[e]xpenses for and cost of investigation and restoration of real

property." *Id.* ¶ 43(E).

66.    Under Montana law, a party may elect to recover restoration costs, in

lieu of diminution in value, for damaged property in appropriate circumstances.

*See Sunburst Sch. Dist. No. 2. v. Texaco*, 2007 MT 183, ¶ 38, 338 Mont. 259, 165

P.3d 1079; *Lampi v. Speed*, 2011 MT 231, ¶¶ 22-23, 362 Mont. 122, 261 P.3d

1000; *McEwen v. MCR, LLC*, 2012 MT 319, ¶ 29, 368 Mont. 38, 291 P.3d 1253.

67.    Montana law requires that a party asserting a restoration claim

demonstrate that any award of restoration damages will actually be used to repair

the damaged property.  In other words, to recover restoration damages under

22

Montana law, the claimant must present evidence that he actually will conduct the restoration work upon which his claim of damages is based. *McEwen*, ¶ 31; *Lampi*, ¶¶ 3, 31; *Sunburst*, ¶ 40.

68.     Defendants' proposed restoration plan is described in expert reports they disclosed in the state court lawsuit. Defendants have stated their intention to perform these restoration actions.

69.     One of Defendants' experts, Richard Pleus, entitled his report "Critique of the Final Baseline Human Health Risk Assessment for the Anaconda Smelter NPL Site, Anaconda, Montana (CDM 1996) and Reassessment of Soil Screening Levels for the Opportunity Community" (attached without exhibits as Exhibit C).  As the title indicates, Dr. Pleus criticizes EPA's risk assessment and chosen action level for soils cleanup at the Site.  Dr. Pleus opines that "[m]y review of the U.S. EPA Superfund ROD for the Anaconda Company Smelter in Anaconda, MT … [and risk assessment] has found that [EPA's] arsenic risk estimate and residential action level of 250 ppm is not appropriate."  Ex. C at v. Dr. Pleus then conducts his own risk assessment and concludes that the soils action level should be 8 ppm.  *Id.* at v; 42-43; 56-57.  Dr. Pleus thus challenges EPA's remedial decision concerning the arsenic action level for residential soils at the Anaconda Smelter Superfund Site.

23

70.     Another of Defendants' experts, John Kane, opines that an alternative restoration of Defendants' properties is necessary above and beyond EPA's chosen remedies for these properties. *See* Expert Report of John R. Kane (attached without exhibits as Exhibit D). Mr. Kane proposes to remove the entirety of the top two feet of soil from every one of Defendants' properties—650,000 tons of soil in all—regardless of whether the soil contains elevated levels of contaminants and regardless of the source of any such contamination, and to transport that soil to a waste repository in Spokane, Washington. *Id.* at 10-11. Mr. Kane then proposes to replace Defendants' yards with "clean" fill from unidentified sources and to re-sod the yards. *Id.* at 10.

71.     Mr. Kane also proposes a groundwater remedy for the Site involving construction of "underground Passive Reactive Barrier (PRB) wall[s]." The largest of these PRB walls would be 8,000 feet long, 15 feet deep, 3 feet wide, and constructed in some unspecified location "up-gradient of Opportunity," with additional, "shorter PRB walls … upgradient of individual Crackerville properties." *Id.* at 11.

72.     Defendants estimate the total cost of their proposed restoration remedy to be between \$38 million and \$101 million.

24

73.    Dr. Pleus's and Mr. Kane's restoration plans for Defendants' properties directly contradict the remedies EPA selected for the Anaconda Smelter Superfund Site.

74.    EPA considered and rejected soils and groundwater remedies similar to those proposed by Mr. Kane in the course of its regulatory deliberations at the Site.

75.    In determining the arsenic action levels for the Site, EPA considered lower levels—which would have required more extensive soil removal and yard replacements—but rejected them as unnecessary to protect human health and the environment.

76.    Likewise, in the course of determining what remedy was required for surface and groundwater in the Opportunity and Crackerville areas, EPA considered a subterranean wall upgradient of Opportunity, but concluded it was unnecessary and impracticable.

77.    Defendants' restoration actions would likely exacerbate conditions at the Site.  Defendants' proposed soils remedy would include tearing up hundreds of acres that currently have established vegetative cover, thus increasing the risk of exposure to contaminants in the soil below the surface.  Furthermore, Defendants' proposed PRB walls could have the undesirable effect of diverting the flow of

groundwater in several areas of concern, which would disrupt and negate the

ongoing groundwater monitoring efforts under EPA's selected cleanup plan.

78.     The remediation standards Defendants intend to apply to the Site and

the restoration actions Defendants intend to perform at the Site are an

impermissible challenge to the remedies selected by EPA, and will impede and

interfere with EPA's selected remedies.

## FIRST CAUSE OF ACTION
### Declaratory Judgment under 28 U.S.C. § 2201

79.     Atlantic Richfield re-alleges and incorporates by reference each of the

allegations above.

80.     The Declaratory Judgment Act provides:

In a case of actual controversy within its jurisdiction ... any court of
the United States, upon the filing of an appropriate pleading, may
declare the rights and other legal relations of any interested party
seeking such declaration, whether or not further relief is or could be
sought.

28 U.S.C. § 2201(a).

81.     Under CERCLA section 113(b), "the United States district courts

shall have exclusive original jurisdiction over all controversies arising under

[CERCLA]." 42 U.S.C. § 9613(b).

26

82.     CERCLA section 113(h) prohibits unauthorized challenges to EPA's selected remedy once the agency has initiated a removal or remedial action under section 104 of CERCLA. 42 U.S.C. §§ 9604, 9613(h).

83.     EPA has initiated removal and remedial actions at the Site. EPA has listed the Anaconda Smelter Site on the NPL and issued numerous RODs and orders concerning Site investigation and cleanup over the past thirty years. Atlantic Richfield has completed multiple RI/FSs at the Site and is currently conducting remedial work at the Site, all pursuant to EPA orders and under the direct supervision of EPA.

84.     In their state court lawsuit, Defendants seek soils and groundwater remedies in addition to and inconsistent with EPA's selected remedy for the Site.

85.     Defendants' proposed restoration remedy presents an illegal and impermissible challenge to EPA's selected remedy under CERCLA section 113(h).

86.     There is an actual and justiciable controversy between Atlantic Richfield and Defendants regarding the rights and obligations of the parties as to the appropriate and permissible soils and groundwater remedies for the Anaconda Smelter Superfund Site in general and Defendants' properties in particular, including whether Defendants are permitted to perform the environmental remedies they have proposed in their state court lawsuit.

27

87.     The issues presented for declaratory judgment are ripe for determination.

88.     There is a substantial and imminent threat that, if Defendants prevail on their common-law restoration claim in state court, Defendants will perform a restoration project that will conflict and interfere with the remedy selected by EPA and the ongoing cleanup of the Site.

89.     The relief requested herein will settle the controversy between the parties regarding the legality of Defendants' proposed restoration remedy, will preserve the integrity of EPA's remedy-selection process and CERCLA authority, and will result in a just and expeditious determination of the controversy between the parties.

90.     Accordingly, pursuant to 28 U.S.C. § 2201, Atlantic Richfield is entitled to a declaration that Defendants' proposed soils and groundwater remedies constitute illegal and impermissible challenges to EPA's selected remedy for the Site and are therefore barred by CERCLA section 113(h).

## SECOND CAUSE OF ACTION
### Injunctive Relief under 28 U.S.C. § 2202

91.     Atlantic Richfield re-alleges and incorporates by reference each of the allegations above.

28

92.     The Declaratory Judgment Act permits the Court to provide "[f]urther necessary or proper relief ... against any adverse party whose rights have been determined by such judgment." 28 U.S.C. § 2202.  This includes injunctive relief.

93.     Under CERCLA section 113(b), "the United States district courts shall have exclusive original jurisdiction over all controversies arising under [CERCLA]."  42 U.S.C. § 9613(b).

94.     CERCLA section 113(h) prohibits unauthorized challenges to EPA's selected remedy once the agency has initiated a removal or remedial action under section 104 of CERCLA.  42 U.S.C. §§ 9604, 9613(h).

95.     EPA has initiated removal and remedial actions at the Site.  EPA has listed the Anaconda Smelter Site on the NPL and issued numerous RODs and orders concerning Site investigation and cleanup over the past thirty years. Atlantic Richfield has completed multiple RI/FSs at the Site and is currently conducting remedial work at the Site, all pursuant to EPA orders and under the direct supervision of EPA.

96.     In their state court lawsuit, Defendants seek soils and groundwater remedies in addition to and inconsistent with EPA's selected remedy for the Site.

97.     Defendants' proposed restoration remedy presents an illegal and impermissible challenge to EPA's selected remedy under CERCLA section 113(h).

98.    Atlantic Richfield will suffer irreparable harm unless an injunction is issued that prohibits Defendants from performing their restoration remedy at the Site. Defendants' alternative restoration plan is incompatible with EPA's selected remedy for the Site, which Atlantic Richfield has been ordered to perform. Without an injunction, the Site may be subject to conflicting remedial orders: EPA's orders requiring Atlantic Richfield to perform the approved CERCLA remedy, and a state court's order requiring Defendants to perform an inconsistent restoration remedy. Moreover, Defendants' proposed restoration project would obstruct the ongoing remedial activities Atlantic Richfield is currently conducting at EPA's direction, and would likely exacerbate contamination issues at the Site.

99.    The harm caused by Defendants' impermissible soils and groundwater remedies would far outweigh any potential harm to Defendants resulting from an injunction requiring them to comply with established federal law governing the remediation of Superfund sites, including the orderly process for community input into remedial decisions. EPA has the necessary knowledge, expertise, and resources to select and execute an appropriate remedy to address any and all environmental concerns at the Site, and only the United States has the legal authority to do so.

100. An injunction requiring Defendants to comply with CERCLA's prohibition on collateral challenges to EPA's selected remedy will also serve the public's interest in the effective and consistent remediation of federal Superfund sites and the effectuation of Congressional intent in passing the CERCLA statute.

## PRAYER FOR RELIEF

WHEREFORE, Atlantic Richfield prays for relief as follows:

a. A declaratory judgment that Defendants' proposed soils and groundwater restoration actions constitute impermissible "challenges" to EPA's selected remedy for the Anaconda Smelter Superfund Site, and are therefore barred by CERCLA, 42 U.S.C. § 9613(h);

b. An injunction enjoining Defendants from performing their proposed soils and groundwater restoration actions at the Anaconda Smelter Superfund Site because they are impermissible "challenges" to EPA's selected remedy for the Site, and therefore barred by CERCLA, 42 U.S.C. § 9613(h); and

c. Such other and further relief as the Court deems just and proper.

31

Dated this 22nd day of December, 2015.

John P. Davis
Patrick M. Sullivan
POORE, ROTH & ROBINSON, P.C.

Jonathan W. Rauchway
Shannon Wells Stevenson
Mark E. Champoux
James R. Henderson
DAVIS GRAHAM & STUBBS LLP

Attorneys for Plaintiff
Atlantic Richfield Company