# EXHIBIT A

UNITED STATES
ENVIRONMENTAL PROTECTION AGENCY
REGION 8

2015 SEP 24  PM 2: 35

FILED
EPA REGION VIII
HEARING CLERK

IN THE MATTER OF:

ANACONDA SMELTER SUPERFUND SITE,
COMMUNITY SOILS OPERABLE UNIT,

ATLANTIC RICHFIELD COMPANY,

RESPONDENT.

PROCEEDING UNDER SECTION 106(a)
OF THE COMPREHENSIVE
ENVIRONMENTAL RESPONSE,
COMPENSATION, AND LIABILITY ACT, AS
AMENDED, 42 U.S.C. § 9606(a).

EPA Docket No. **CERCLA–08–2015–0011**

## UNILATERAL ADMINISTRATIVE ORDER FOR REMEDIAL ACTION

TABLE OF CONTENTS

I.       JURISDICTION AND GENERAL PROVISIONS .......................................................1
II.      PARTIES BOUND ...................................................................................................1
III.     DEFINITIONS..........................................................................................................1
IV.      FINDINGS OF FACT...............................................................................................4
V.       CONCLUSIONS OF LAW AND DETERMINATIONS.............................................7
VI.      ORDER ....................................................................................................................8
VII.     OPPORTUNITY TO CONFER................................................................................8
VIII.    EFFECTIVE DATE ..................................................................................................9
IX.      NOTICE OF INTENT TO COMPLY .......................................................................9
X.       PERFORMANCE OF THE WORK ...........................................................................9
XI.      PROPERTY REQUIREMENTS .............................................................................12
XII.     FINANCIAL ASSURANCE ...................................................................................13
XIII.    INSURANCE...........................................................................................................16
XIV.     DELAY IN PERFORMANCE .................................................................................17
XV.      PAYMENT OF RESPONSE COSTS.......................................................................17
XVI.     ACCESS TO INFORMATION ...............................................................................18
XVII.    RECORD RETENTION ..........................................................................................19
XVIII.   ENFORCEMENT/WORK TAKEOVER ..................................................................20
XIX.     RESERVATIONS OF RIGHTS ..............................................................................20
XX.      OTHER CLAIMS ...................................................................................................21
XXI.     ADMINISTRATIVE RECORD ..............................................................................21
XXII.    DOCUMENTS INCORPORATED BY REFERENCE .............................................21
XXIII.   SEVERABILITY ....................................................................................................22

ii

## I.    JURISDICTION AND GENERAL PROVISIONS

1.    This Administrative Order (Order) is issued under the authority vested in the President of the United States by section 106(a) of the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. § 9606(a). This authority was delegated to the Administrator of the United States Environmental Protection Agency (EPA) by Executive Order No. 12580, 52 Fed. Reg. 2923 (Jan. 23, 1987), and further delegated to the Regional Administrators by EPA Delegation Nos. 14-14-A and 14-14-B. These authorities were further redelegated by the Regional Administrator of EPA Region 8 to the Assistant Regional Administrator, Office of Ecosystems Protection and Remediation, by EPA Region 8 delegation Nos. 14-14-A, April 23, 2002, and 14-14-B, December 20, 1996. These delegations provide also that the Assistant Regional Administrator, Office of Enforcement, Compliance, and Environmental Justice, must concur with the issuance of this Order.

2.    This Order pertains to property located at the Anaconda Smelter Superfund Site, Community Soils Operable Unit (CSOU) in Anaconda, Deer Lodge County, Montana. This Order directs Respondent to perform the remedial action (RA) described in the Record of Decision (ROD) for the CSOU, dated September 30, 1996, and the ROD Amendment dated September 30, 2013.

3.    The EPA has notified the State of Montana (State) of this action pursuant to section 106(a) of CERCLA, 42 U.S.C. § 9606(a).    .

## II.    PARTIES BOUND

4.    This Order applies to and is binding upon Respondent and its successors and assigns. Any change in ownership or control of the Site or change in corporate or partnership status of Respondent, including, but not limited to, any transfer of assets or real or personal property, shall not alter Respondent's responsibilities under this Order.

5.    Respondent is liable for implementing all activities required by this Order.

6.    Respondent shall provide a copy of this Order to each contractor hired to perform the Work required by this Order and to each person representing Respondent with respect to the Site or the Work, and shall condition all contracts entered into hereunder upon performance of the Work in conformity with the terms of this Order. Respondent or its contractors shall provide written notice of the Order to all subcontractors hired to perform any portion of the Work required by this Order. Respondent shall nonetheless be responsible for ensuring that its contractors and subcontractors perform the Work in accordance with the terms of this Order.

## III.    DEFINITIONS

7.    Unless otherwise expressly provided in this Order, terms used in this Order that are defined in CERCLA or in regulations promulgated under CERCLA shall have the meaning assigned to them in CERCLA or in such regulations. Whenever terms listed below are used in this Order or in its appendices, the following definitions shall apply solely for the purposes of this Order:

"Affected Property" shall mean all real property at the Site and any other real property where the EPA determines, at any time, that access, land, water, or other resource use restrictions, and/or ICs are needed to implement the RA, including, but not limited to, all residential properties within the CSOU.

"CERCLA" shall mean the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C. §§ 9601-9675.

"Community Soils Operable Unit" or "CSOU" shall mean the portion of the Anaconda Smelter Superfund Site that already has or will involve the removal of arsenic and lead contamination in residential yards and attics.

"Day" or "day" shall mean a calendar day. In computing any period of time under this Order, where the last day would fall on a Saturday, Sunday, or federal or State holiday, the period shall run until the close of business of the next working day.

"Effective Date" shall mean the effective date of this Order as provided in Section VIII.

"EPA" shall mean the U.S. Environmental Protection Agency and its successor departments, agencies, or instrumentalities.

"EPA Hazardous Substance Superfund" shall mean the Hazardous Substance Superfund established by the Internal Revenue Code, 26 U.S.C. § 9507.

"Institutional Controls" or "ICs" shall mean Proprietary Controls and state or local laws, regulations, ordinances, zoning restrictions, or other governmental controls, programs, or notices that: (a) limit land, water, or other resource use to minimize the potential for human exposure to Waste Material at or in connection with the Site; (b) may limit land, water, or other resource use to implement, ensure non-interference with, or ensure the protectiveness of the RA; and/or (c) provide information intended to modify or guide human behavior at or in connection with the Site.

"Interest" shall mean interest at the rate specified for interest on investments of the EPA Hazardous Substance Superfund, compounded annually on October 1 of each year, in accordance with 42 U.S.C. § 9607(a). The applicable rate of interest shall be the rate in effect at the time the interest accrues. The rate of interest is subject to change on October 1 of each year. Rates are available online at http://www.epa.gov/ocfopage/finstatement/superfund/int_rate.htm.

"National Contingency Plan" or "NCP" shall mean the National Oil and Hazardous Substances Pollution Contingency Plan promulgated pursuant to section 105 of CERCLA, 42 U.S.C. § 9605, codified at 40 C.F.R. Part 300, and any amendments thereto.

"Non-Respondent Owner" shall mean any person, other than Respondent, that owns or controls any Affected Property. The phrase "Non-Respondent Owner's Affected Property" means Affected Property owned or controlled by any Non-Respondent Owner.

2

"Operable Unit" or "OU" shall mean a portion of a Superfund Site that addresses a specific cleanup activity. The CSOU addresses all residential cleanup at the Anaconda Smelter Superfund Site.

"Operation and Maintenance" or "O&M" shall mean all activities required to operate, maintain, and monitor the effectiveness of the RA as specified in the CSOU RAWP/FDR or any EPA-approved O&M Plan.

"Order" shall mean this Unilateral Administrative Order and all reference documents incorporated herein. In the event of conflict between this Order and any referenced document, this Order shall control.

"Paragraph" or "¶" shall mean a portion of this Order identified by an Arabic numeral or an upper or lower case letter.

"Parties" shall mean the EPA and Respondent.

"Performance Standards" shall mean the cleanup standards and other measures of achievement of the goals of the remedial action objectives, as set forth in the ROD and ROD Amendment.

"Proprietary Controls" shall mean easements or covenants running with the land that: (a) limit land, water, or other resource use and/or provide access rights; and (b) are created pursuant to common law or statutory law by an instrument that is recorded in the appropriate land records office.

"RCRA" shall mean the Resource Conservation and Recovery Act, also known as the Solid Waste Disposal Act, 42 U.S.C. §§ 6901-6992.

"Record of Decision" or "ROD" shall mean the EPA ROD relating to the CSOU signed on September 30, 1996, by the Director, Ecosystems Protection and Remediation Division, EPA Region 8, Superfund Enterprise Management System Document ID Number 1164438, Reference A, and the ROD Amendment signed on September 30, 2013, by the Assistant Regional Administrator, Office of Ecosystems Protection and Remediation, EPA Region 8, Superfund Enterprise Management System Document ID Number 1280692, Reference B, and all attachments thereto.

"Remedial Action" or "RA" shall mean the remedial action selected in the ROD and ROD Amendment. For the purposes of this Order, the RA involves the removal of residential yard soils and attic dust with concentrations of arsenic over 250 parts per million and concentrations of lead over 400 parts per million.

"Remedial Action Work Plan/Final Design Report" or "RAWP/FDR" shall mean the 2015 Residential Soils/Dust Remedial Action Work Plan/Final Design Report (August 2015), Superfund Enterprise Management System Document ID Number 1549208, Reference C, incorporated herein by reference.

"Remedial Design" or "RD" shall mean the RAWP/FDR.

3

"Respondent" shall mean the Atlantic Richfield Company, a corporation doing business in the State of Montana.

"Response Costs" shall mean all costs, including direct, indirect, payroll, contractor, U.S. Department of Justice, State, travel, and laboratory costs, that the United States incurs in overseeing Respondent's performance of the Work, including reviewing deliverables submitted under this Order.

"Section" shall mean a portion of this Order identified by a Roman numeral.

"Site" means all current residential areas within the Anaconda Smelter Superfund Site, as more particularly described in the ROD, ROD Amendment, and the CSOU RAWP/FDR, and depicted generally on the map shown as Figure 1 to the CSOU RAWP/FDR.

"State" shall mean the State of Montana.

"Supervising Contractor" shall mean the principal contractor retained by Respondent to supervise and direct the implementation of the Work under this Order.

"Transfer" shall mean to sell, assign, convey, lease, mortgage, or grant a security interest in, or where used as a noun, a sale, assignment, conveyance, or other disposition of any interest by operation of law or otherwise.

"United States" shall mean the United States of America and each department, agency, and instrumentality of the United States, including the EPA.

"Waste Material" shall mean: (a) any "hazardous substance" under section 101(14) of CERCLA, 42 U.S.C. § 9601(14); (b) any pollutant or contaminant under section 101(33) of CERCLA, 42 U.S.C. § 9601(33); (c) any "solid waste" under section 1004(27) of RCRA, 42 U.S.C. § 6903(27); and (d) any "hazardous or deleterious substance" under the Montana Comprehensive Environmental Cleanup and Responsibility Act, § 75-10-701(8), Montana Code Annotated.

"Work" shall mean all activities Respondent is required to perform under this Order, except those required by Section XVII (Record Retention).

## IV.   FINDINGS OF FACT

8.     The Anaconda Smelter Superfund Site encompasses approximately 300 square miles in southern Deer Lodge Valley and the surrounding foothills near and including Anaconda, Montana. It consists of residential, commercial, industrial, agricultural, pasture, rangeland, forest, and riparian and wetland areas containing large volumes of hazardous substances resulting primarily from copper smelting and milling operations that took place near Anaconda. The CSOU concerns soils in yards and dust in attics of certain houses in Anaconda, the community of Opportunity, and rural areas in Deer Lodge County.

4

9.      Respondent and its predecessors owned and operated the copper smelting and milling facilities at the Upper and Lower Works, and the Washoe Reduction Works or New Works (also known as the Anaconda Reduction Works), near Anaconda, Montana, from 1884 to 1980. Respondent continues to own most of these facilities. These copper production activities resulted in the contamination of soils, surface water, and ground water primarily through airborne emissions and disposal practices from smelting operations. Airborne emissions included smoke from the 585 foot tall stack, dust from facility operations, tailings, and slag. The primary contaminants of concern are arsenic, cadmium, copper, lead, and zinc. The contaminants of concern for the CSOU are arsenic and lead.

10.      Arsenic and lead are found in yard soils and in attic dust at residences in the CSOU at concentrations well in excess of the action level of 250 parts per million for arsenic and 400 parts per million for lead.

11.      Humans living at approximately 2500 specific residences in Anaconda, Opportunity and rural areas in Deer Lodge County are subject to the actual and/or potential release of arsenic and lead in yard soils and attic dust through the inhalation and ingestion pathways.

12.      Lead can cause behavioral and learning problems, lower intellectual development, hyperactivity, slowed growth, hearing problems, and anemia in children. Lead can cause cardiovascular problems, increased blood pressure and incidence of hypertension, decreased kidney function, and reproductive problems (for both men and women) in adults.

13.      Arsenic can cause thickening and discoloration of the skin, stomach pain, nausea, vomiting; diarrhea; numbness in hands and feet; partial paralysis; and blindness. Arsenic has been linked to cancer of the bladder, lungs, skin, kidney, nasal passages, liver, and prostate.

14.      The Respondent, the Atlantic Richfield Company, is a corporation doing business in the State of Montana. It is currently organized under the laws of the State of Delaware. Respondent is an affiliate of BP Corporation North America, Inc.

>        a.      The Respondent is now, and has been since on or about 1977, the owner and/or operator of the "facility," as defined below.
>
>        b.      As a result of one or more mergers, restructurings, transfers of assets, continuations of business activities, or other corporate action, the Respondent is the successor-in-interest to, and has assumed the liabilities incurred by the Anaconda Copper Mining Company and/or its subsidiaries and related corporations or businesses, including historical predecessors.

15.      Pursuant to section 105 of CERCLA, 42 U.S.C. § 9605, the EPA placed the Anaconda Smelter Superfund Site, including the CSOU, on the National Priorities List set forth at 40 C.F.R. Part 300, Appendix B, by publication in the Federal Register on September 8, 1983, 48 Fed. Reg. 40658.

16.      In response to a release or a substantial threat of a release of hazardous substances at or from the CSOU, from 1995 to 1996, Respondent, with EPA oversight, undertook a remedial

5

investigation and feasibility study for the CSOU, pursuant to CERCLA and the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300 (NCP).

17.    Pursuant to section 117 of CERCLA, 42 U.S.C. § 9617, the EPA published notice of the proposed plan for amended remedial action at the CSOU on July 5 and 10, 1996, in the *Anaconda Leader*, a major local newspaper of general circulation. The EPA provided an opportunity for written and oral comments from the public on the proposed plan for Remedial Action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Regional Administrator, EPA Region 8, based the selection of the response action.

18.    The decision by the EPA on the RA to be implemented at the CSOU is embodied in a final amended ROD, executed on September 30, 1996, Superfund Enterprise Management System Document ID Number 1164438, Reference A, on which the State has given its concurrence. The ROD includes a responsiveness summary to the public comments. Notice of the final plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

19.    The EPA divided the Anaconda Smelter Superfund Site into operable units. The CSOU consists of all soils in current residential areas anywhere within the Anaconda Smelter Superfund Site, an area of approximately 300 square miles in southern Deer Lodge Valley, including the town of Anaconda, other small communities, and surrounding foothills.

20.    From about October 1996 to July 2002, Respondent, with EPA oversight, completed the CSOU Residential Soils Remedial Action Work Plan/Final Design Report (2002) pursuant to Administrative Order on Consent, Docket No. CERCLA-VIII-88-16, Amendment 11. The EPA approved this Remedial Action Work Plan/Final Design Report on July 19, 2002, with concurrence by the State.

21.    On August 14, 2002, the EPA issued Administrative Order Docket No. CERCLA-08-2002-08 to Respondent requiring it to perform the work outlined in the CSOU Residential Soils Remedial Action Work Plan/Final Design Report (2002).

22.    Respondent performed this work with oversight by the EPA from July 2002 through 2010. During that time period, Respondent sampled approximately 1,740 residences in Anaconda and the surrounding rural area and addressed 350 yards with arsenic concentrations exceeding 250 parts per million.

23.    Sampling results obtained during the residential cleanup showed that lead was a larger factor in these yards than expected. Additional information showed that attic dust in some residences contained arsenic and/or lead at concentrations that posed a potential or actual threat to residents.

24.    A five year review published in 2006 and other studies concluded that lead in some alleys and residential yards and both lead and arsenic in some residential attics also presented unacceptable risks, though these had not been addressed in the remedial action that began in 2002.

6

25.     Pursuant to section 117 of CERCLA, 42 U.S.C. § 9617, the EPA published notice of the proposed plan for amended remedial action at the CSOU on September 28, 2012, in a major local newspaper of general circulation. The EPA provided an opportunity for written and oral comments from the public on the proposed plan for remedial action. A copy of the transcript of the public meeting is available to the public as part of the administrative record upon which the Regional Administrator, EPA Region 8, based the selection of the response action.

26.     The decision by the EPA on the amended remedial action to be implemented at the CSOU is embodied in a final amended ROD, executed on September 30, 2013, Superfund Enterprise Management System Document ID Number 1229145, Reference B, on which the State has given its concurrence. The amended ROD includes a responsiveness summary to the public comments. Notice of the final amended plan was published in accordance with Section 117(b) of CERCLA, 42 U.S.C. § 9617(b).

27.     From about October 2014 to July 2015, the Respondent, with EPA oversight, completed the RAWP/FDR for the CSOU, Superfund Enterprise Management System Document ID Number 1549208, Reference C, pursuant to Administrative Order on Consent, Docket No. CERCLA VIII 88 16, Amendment 13.

28.     The EPA's remedial design and remedial action decision for the CSOU is embodied in the RAWP/FDR approved August 31, 2015, Superfund Enterprise Management System Document ID Number 1567335, Reference D.

## V.     CONCLUSIONS OF LAW AND DETERMINATIONS

29.     Based on the Findings of Fact set forth above and the administrative record, the EPA has determined that:

a.     The Site, including the CSOU, is a "facility" as defined in section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

b.     Respondent is a "person" as defined by section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

c.     Respondent is a liable party under one or more provisions of section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

d.     Respondent is the "owner" and/or "operator" of portions of the facility, as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of section 107(a)(1) of CERCLA, 42 U.S.C. § 9607(a)(1).

e.     Respondent was the "owner" and/or "operator" of portions of the facility at the time of disposal of hazardous substances there, as defined by section 101(20) of CERCLA, 42 U.S.C. § 9601(20), and within the meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

f.      Respondent arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment of hazardous substances at the facility, within the meaning of section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

30.      The contamination, including lead and arsenic found at the Site, as identified in the Findings of Fact above, includes "hazardous substances" as defined by section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

31.      The conditions described in the Findings of Fact above constitute an actual and/or threatened "release" of a hazardous substance from the facility as defined by section 101(22) of CERCLA, 42 U.S.C.§ 9601(22).

32.      The conditions at the Site may constitute a threat to public health or welfare or the environment, based on the factors set forth in the ROD and ROD Amendment. These factors include, but are not limited to, the following: elevated concentrations of lead in yard soils and elevated concentrations of lead and arsenic in attic dust.

33.      Solely for the purposes of section 113(j) of CERCLA, 42 U.S.C. § 9613(j), the remedy set forth in the ROD and ROD Amendment and the Work to be performed by Respondent shall constitute a response action taken or ordered by the President for which judicial review shall be limited to the administrative record.

34.      The conditions at the Site may constitute an imminent and substantial endangerment to public health or welfare or the environment.

35.      The actions required by this Order are necessary to protect the public health, welfare, or the environment.

## VI.    ORDER

36.      Based on the foregoing Findings of Fact, Conclusions of Law and Determinations, and the administrative record, Respondent is hereby ordered to comply with this Order and any modifications to this Order.

## VII.    OPPORTUNITY TO CONFER

37.      Within 10 days after the Order is signed by the Regional Administrator or his/her delegatee, Respondent may request a conference with the EPA to discuss this Order, including its applicability, the factual findings and the determinations upon which it is based, the appropriateness of any actions Respondent is ordered to take, or any other relevant and material issues or contentions that Respondent may have regarding this Order.

38.      Respondent may appear in person or by an attorney or other representative at the conference. Any such conference shall be held at least 14 days prior to the Effective Date. Respondent may also submit written comments or statements of position on any matter pertinent to this Order no later than 5 days after the conference or within 20 days after this Order is signed if a conference is not requested. This conference is not an evidentiary hearing, does not constitute a proceeding to challenge this Order, and does not give Respondent a right to seek

8

review of this Order. Any request for a conference or written comments or statements should be submitted to:

> Andrew J. Lensink
> Legal Enforcement Program
> Office of Enforcement, Compliance, and Environmental Justice
> U.S. Environmental Protection Agency Region 8
> 1595 Wynkoop Street
> Denver, CO 80202
> 303-312-6908
> lensink.andyepa.gov

## VIII.   EFFECTIVE DATE

39.     This Order shall be effective 30 days after the Order is signed by the Regional Administrator or his/her delegatee unless a conference is requested or written materials are submitted in accordance with ¶ 37. If a conference is requested or written materials are submitted, this Order shall be effective on the later of the 10th day after the day of the conference, or the 10th day after written materials, if any, are submitted, unless EPA determines that the Order should be modified based on the conference or written materials. In such event, EPA shall notify Respondent, within the 10 day period, that EPA intends to modify the Order. The modified Order shall be effective 5 days after it is signed by the Regional Administrator or his/her delegatee.

## IX.    NOTICE OF INTENT TO COMPLY

40.     On or before the Effective Date, Respondent shall notify the EPA in writing of Respondent's irrevocable intent to comply with this Order. Such written notice shall be sent to the EPA as provided in ¶ 38.

41.     Respondent's written notice shall describe, using facts that exist on or prior to the Effective Date, any "sufficient cause" defense under sections 106(b) and 107(c)(3) of CERCLA, 42 U.S.C. §§ 9606(b) and 9607(c)(3). The absence of a response by the EPA to the notice required by this Paragraph shall not be deemed to be acceptance of Respondent's assertions. Failure of Respondent to provide such notification within this time period shall, as of the Effective Date, be treated as a violation of this Order by such Respondent.

## X.    PERFORMANCE OF THE WORK

42.     **Compliance with Applicable Law**. Nothing in this Order limits Respondent's obligations to comply with the requirements of all applicable federal and state laws and regulations. Respondent must also comply with all applicable or relevant and appropriate requirements of all federal and state environmental laws as set forth in the ROD, ROD Amendment, and the RAWP/FDR.

43. **Permits**.

    a.    As provided in section 121(e) of CERCLA, 42 U.S.C. § 9621(e), and section 300.400(e) of the NCP, no permit shall be required for any portion of the Work conducted entirely on-site (i.e., within the areal extent of contamination or in very close proximity to the contamination and necessary for implementation of the Work). Where any portion of the Work that is not on-site requires a federal or state permit or approval, Respondent shall submit timely and complete applications and take all other actions necessary to obtain all such permits or approvals.

    b.    This Order is not, and shall not be construed to be, a permit issued pursuant to any federal or state statute or regulation.

44. **Coordination and Supervision.**

    a.    **Project Coordinators.**

        (1)    Respondent's Project Coordinator must have sufficient technical expertise to coordinate the Work. Respondent's Project Coordinator may not be an attorney representing any Respondent in this matter and may not act as the Supervising Contractor. Respondent's Project Coordinator may assign other representatives, including other contractors, to assist in coordinating the Work.

        (2)    The EPA shall designate and notify the Respondent of the EPA's Project Coordinator and Alternate Project Coordinators. The EPA may designate other representatives, which may include its employees, contractors and/or consultants, to oversee the Work. The EPA's Project Coordinator/Alternate Project Coordinator will have the same authority as a remedial project manager and/or an on-scene coordinator, as described in the NCP. This includes the authority to halt the Work and/or to conduct or direct any necessary response action when he or she determines that conditions at the Site constitute an emergency or may present an immediate threat to public health or welfare or the environment due to a release or threatened release of Waste Material.

        (3)    Respondent's Project Coordinators shall meet with the EPA's Project Coordinator at least monthly.

    b.    **Supervising Contractor**. Respondent's proposed Supervising Contractor must have sufficient technical expertise to supervise the Work and a quality assurance system that complies with ASQ/ANSI E4:2014, "Quality Systems for Environmental Data and Technology Programs: Requirements with Guidance for Use" (American Society for Quality, Feb. 2014).

c.      **Procedures for Disapproval/Notice to Proceed**.

(1)      Respondent shall designate, and notify the EPA, within 10 days after the Effective Date, of the names, contact information, and qualifications of the Respondent's proposed Project Coordinator and Supervising Contractor.

(2)      The EPA shall issue notices of disapproval and/or authorizations to proceed regarding the proposed Project Coordinator and Supervising Contractor, as applicable. If the issues a notice of disapproval, Respondent shall, within 30 days, submit to the EPA a list of supplemental proposed Project Coordinators and/or Supervising Contractors, as applicable, including a description of the qualifications of each. The EPA shall issue a notice of disapproval or authorization to proceed regarding each supplemental proposed coordinator and/or contractor. Respondent may select any coordinator/contractor covered by an authorization to proceed and shall, within 21 days, notify the EPA of Respondent's selection.

(3)      Respondent may change its Project Coordinator and/or Supervising Contractor, as applicable, by following the procedures of ¶¶ 44.c(1) and 44.c(2).

45.      **Performance of Work in Accordance with RAWP/FDR**. Respondent shall: (a) perform the RA; (b) operate, maintain, and monitor the effectiveness of the RA; and (c) support the EPA's periodic review efforts; all in accordance with the RAWP/FDR and all EPA-approved, conditionally-approved, or modified deliverables as required by the RAWP/FDR. All deliverables required to be submitted for approval under the Order or RAWP/FDR shall be subject to approval by the EPA.

46.      **Emergencies and Releases**. Respondent shall comply with the emergency and release response and reporting requirements under the Site Specific Health and Safety Plan that is a deliverable under Appendix B (Construction Quality Assurance Plan) to the RAWP/FDR.

47.      **Community Involvement**. If requested by the EPA, Respondent shall conduct community involvement activities under the EPA's oversight as provided for in, and in accordance with, the RAWP/FDR. Such activities may include, but are not limited to, designation of a Community Involvement Coordinator.

48.      **Modification**.

a.      The EPA may, by written notice from the EPA Project Coordinator (RPM) to Respondent, modify, or direct Respondent to modify, the RAWP/FDR and/or any deliverable developed under the RAWP/FDR, if such modification is necessary to achieve or maintain the Performance Standards or to carry out and maintain the effectiveness of the RA, and such modification is consistent with the Scope of the Remedy set forth in Sections 1.1 (Purpose and Scope), 1.5 (Description of the CSOU Selected Response Action), and 1.6 (Community Soils OU Remedial Action Objectives) of the RAWP/FDR. Any other requirements of this Order may be modified in writing by signature of the Assistant Regional Administrator, Ecosystems Protection and Remediation.

b.      Respondent may submit written requests to modify the RAWP/FDR and/or any deliverable developed under the RAWP/FDR. If the EPA approves the request in writing, the modification shall be effective upon the date of such approval or as otherwise specified in the approval. Respondent shall modify the RAWP/FDR and/or related deliverables in accordance with the EPA's approval.

c.      No informal advice, guidance, suggestion, or comment by the EPA Project Coordinator or other EPA representatives regarding reports, plans, specifications, schedules, or any other writing submitted by Respondent shall relieve Respondent of its obligation to obtain any formal approval required by this Order, or to comply with all requirements of this Order, unless it is formally modified.

d.      Nothing in this Order, the attached RAWP/FDR, any deliverable required under the RAWP/FDR, or any approval by the EPA constitutes a warranty or representation of any kind by the EPA that compliance with the work requirements set forth in the RAWP/FDR or related deliverable will achieve the Performance Standards.

## XI.     PROPERTY REQUIREMENTS

49.     **Agreements Regarding Access and Non-Interference**. Respondent shall, with respect to any Non-Respondent Owner's Affected Property, use best efforts to secure from such Non-Respondent Owner an agreement, enforceable by Respondent and by the EPA, providing that such Non-Respondent Owner: (i) provide the EPA and its representatives, contractors, and subcontractors with access at all reasonable times to such Affected Property to conduct any activity regarding the Order, including those listed in ¶ 49.a (Access Requirements); and (ii) refrain from using such Affected Property in any manner that the EPA determines will pose an unacceptable risk to human health or to the environment due to exposure to Waste Material, or interfere with or adversely affect the implementation, integrity, or protectiveness of the Remedial Action.

a.      **Access Requirements**. The following is a list of activities for which access is required regarding the Affected Property:

(1)     Monitoring the Work;

(2)     Verifying any data or information submitted to EPA;

(3)     Conducting investigations regarding contamination at or near the Site;

(4)     Obtaining samples;

(5)     Assessing the need for, planning, or implementing additional response actions at or near the Site;

(6)     Assessing implementation of quality assurance and quality control practices as defined in the approved construction quality assurance quality control plan as provided in the RAWP/FDR;

(7) Implementing the Work pursuant to the conditions set forth in ¶ 72 (Work Takeover);

(8) Inspecting and copying records, operating logs, contracts, or other documents maintained or generated by Respondent or its agents, consistent with Section XVI (Access to Information);

(9) Assessing Respondent's compliance with the Order;

(10) Determining whether the Affected Property is being used in a manner that is prohibited or restricted, or that may need to be prohibited or restricted under the Order; and

(11) Implementing, monitoring, maintaining, reporting on, and enforcing any Institutional Controls.

50. **Best Efforts**. As used in this Section, "best efforts" means the efforts that a reasonable person in the position of Respondent would use so as to achieve the goal in a timely manner, including the cost of employing professional assistance and the payment of reasonable sums of money to secure access and/or use restriction agreements. If, within 30 days after the Effective Date, Respondent is unable to accomplish what is required through "best efforts," it shall notify the EPA, and include a description of the steps taken to comply with the requirements. If the EPA deems it appropriate, it may assist Respondent, or take independent action, in obtaining such access and/or use restrictions. The EPA reserves the right to pursue cost recovery regarding all costs incurred by the United States in providing such assistance or taking such action, including the cost of attorney time and the amount of monetary consideration or just compensation paid.

51. Respondent shall cooperate with the EPA's and the State's efforts to secure and ensure compliance with Institutional Controls, including the Community Protective Measures Program, as outlined in the RAWP/FDR.

52. In the event of any Transfer of the Affected Property, unless the EPA otherwise consents in writing, Respondent shall continue to comply with its obligations under the Order, including its obligation to secure access and ensure compliance with any use restrictions regarding the Affected Property.

## XII. FINANCIAL ASSURANCE

53. In order to ensure completion of the Work, Respondent shall secure financial assurance, initially in the amount of $20,000,000 ("Estimated Cost of the Work"). The financial assurance must be one or more of the mechanisms listed below, in a form substantially identical to the relevant sample documents available under "Financial Assurance" at http://cfpub.epa.gov/compliance/resources/policies/cleanup/superfund/index.cfm), and satisfactory to the EPA. Respondent may use multiple mechanisms if they are limited to trust funds, surety bonds guaranteeing payment, and/or letters of credit.

13

a.      A trust fund: (1) established to ensure that funds will be available as and when needed for performance of the Work required by this Order; (2) administered by a trustee that has the authority to act as a trustee and whose trust operations are regulated and examined by a federal or state agency; and (3) governed by an agreement that requires the trustee to make payments from the fund only when the Assistant Regional Administrator, Office of Enforcement, Compliance, and Environmental Justice advises the trustee in writing that: (A) payments are necessary to fulfill the Respondent's obligations under the Order; or (B) funds held in trust are in excess of the funds that are necessary to complete the performance of Work in accordance with this Order;

b.      A surety bond, issued by a surety company among those listed as acceptable sureties on federal bonds as set forth in Circular 570 of the U.S. Department of the Treasury, guaranteeing payment or performance in accordance with ¶ 58 (Access to Financial Assurance);

c.      An irrevocable letter of credit, issued by an entity that has the authority to issue letters of credit and whose letter-of-credit operations are regulated and examined by a federal or state agency, guaranteeing payment in accordance with ¶ 58 (Access to Financial Assurance);

d.      A demonstration by Respondent that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee; or

e.      A guarantee to fund or perform the Work executed by one of the following: (1) a direct or indirect parent company of Respondent; or (2) a company that has a "substantial business relationship" (as defined in 40 C.F.R. § 264.141(h)) with Respondent; provided, however, that any company providing such a guarantee must demonstrate to the EPA's satisfaction that it meets the relevant financial test criteria of 40 C.F.R. § 264.143(f) and reporting requirements of this Section for the sum of the Estimated Cost of the Work and the amounts, if any, of other federal, state, or tribal environmental obligations financially assured through the use of a financial test or guarantee.

54.    **Standby Trust.** If Respondent seeks to establish financial assurance by using a surety bond, a letter of credit, or a corporate guarantee, Respondent shall at the same time establish and thereafter maintain a standby trust fund, which must meet the requirements specified in ¶ 53.a, and into which payments from the other financial assurance mechanism can be deposited if the financial assurance provider is directed to do so by the EPA pursuant to ¶ 58 (Access to Financial Assurance). An originally signed duplicate of the standby trust agreement must be submitted, with the other financial mechanism, to the EPA in accordance with ¶ 55. Until the standby trust fund is funded pursuant to ¶ 58 (Access to Financial Assurance), neither payments into the standby trust fund nor annual valuations are required.

55.    Within 30 days after the Effective Date, Respondent shall submit to the EPA proposed financial assurance mechanisms in draft form in accordance with ¶ 53 for the EPA's review. Within 60 days after the Effective Date, or 30 days after the EPA's approval of the form

14

and substance of Respondent's financial assurance, whichever is later, Respondent shall secure all executed and/or otherwise finalized mechanisms or other documents consistent with the EPA-approved form of financial assurance and shall submit one original copy of each of such mechanisms and documents to the following: CERCLA Financial Assurance, Mail Code: 8ENF-RC, EPA Region 8, 1595 Wynkoop Street, Denver, CO 80202.

56.     If Respondent provides financial assurance by means of a demonstration or guarantee under ¶ 53.d or 53.e, it shall also comply, and shall ensure that its guarantors comply, with the other relevant criteria and requirements of 40 C.F.R. § 264.143(f) and this Section, including: (a) the initial submission to the EPA of required documents from its chief financial officer and independent certified public accountant no later than 90 days after the Effective Date; (b) the annual resubmission of such documents within 90 days after the close of its fiscal year; and (c) the notification to the EPA no later than 30 days, in accordance with ¶ 57, after it determines that it no longer satisfies the financial test criteria and requirements set forth at 40 C.F.R. § 264.143(f)(1). For purposes of this Section, references in 40 C.F.R. Part 264, Subpart H, to: (1) the terms "current closure cost estimate," "current post-closure cost estimate," and "current plugging and abandonment cost estimate" include the Estimated Cost of the Work; (2) "the sum of the current closure and post-closure cost estimates and the current plugging and abandonment cost estimates" mean the sum of all environmental obligations (including obligations under CERCLA, RCRA, and any other federal, state, or tribal environmental obligation) guaranteed by such company or for which such company is otherwise financially obligated, in addition to the Estimated Cost of the Work under this Order; (3) the terms "owner" and "operator" include the Respondent if it is making a demonstration or obtaining a guarantee under ¶ 53.d or 53.e; and (4) the terms "facility" and "hazardous waste management facility" include the Site.

57.     Respondent shall diligently monitor the adequacy of the financial assurance. If Respondent becomes aware of any information indicating that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, Respondent shall notify the EPA of such information within 30 days. If the EPA determines that the financial assurance provided under this Section is inadequate or otherwise no longer satisfies the requirements of this Section, the EPA will notify the Respondent of such determination. Respondent shall, within 30 days after notifying the EPA or receiving notice from the EPA under this Paragraph, secure and submit to EPA for approval a proposal for a revised or alternative financial assurance mechanism that satisfies the requirements of this Section. Respondent shall follow the procedures of ¶ 59 in seeking approval of, and submitting documentation for, the revised or alternative financial assurance mechanism. Respondent's inability to secure and submit to the EPA financial assurance in accordance with this Section shall in no way excuse performance of any other requirements of this Order, including, without limitation, the obligation of Respondent to complete the Work in accordance with the terms of this Order.

58.     **Access to Financial Assurance.**

a.     If the EPA determines that Respondent (1) has ceased implementation of any portion of the Work, (2) is seriously or repeatedly deficient or late in its performance of the Work, or (3) is implementing the Work in a manner that may cause an endangerment to human health or the environment, the EPA may issue a written notice ("Performance Failure Notice") to

15

both Respondent and the financial assurance provider regarding the Respondent's failure to perform. Any Performance Failure Notice issued by the EPA will specify the grounds upon which such notice was issued and will provide Respondent a period of 10 days within which to remedy the circumstances giving rise to the EPA's issuance of such notice. If, after expiration of the 10-day period specified in this Paragraph, Respondent has not remedied to the EPA's satisfaction the circumstances giving rise to the EPA's issuance of the relevant Performance Failure Notice, then, in accordance with any applicable financial assurance mechanism, the EPA may at any time thereafter direct the financial assurance provider to immediately: (i) deposit any funds assured pursuant to this Section into the standby trust fund; or (ii) arrange for performance of the Work in accordance with this Order.

    b. If the EPA is notified by the provider of a financial assurance mechanism that it intends to cancel the mechanism, and the Respondent fails to provide an alternative financial assurance mechanism in accordance with this Section at least 30 days prior to the cancellation date, the EPA may, prior to cancellation, direct the financial assurance provider to deposit any funds guaranteed under such mechanism into the standby trust fund for use consistent with this Section.

    59. **Modification of Amount, Form, or Terms of Financial Assurance**. Respondent may submit, on any anniversary of the Effective Date or following Respondent's request for, and the EPA's approval of, another date, a request to reduce the amount, or change the form or terms, of the financial assurance mechanism. Any such request must be submitted to the EPA individual(s) referenced in ¶ 55, and must include an estimate of the cost of the remaining Work, an explanation of the bases for the cost calculation, a description of the proposed changes, if any, to the form or terms of the financial assurance, and any newly proposed financial assurance documentation in accordance with the requirements of ¶¶ 53 and 54. The EPA will notify Respondent of its decision to approve or disapprove a requested reduction or change. Respondent may reduce the amount of the financial assurance mechanism only in accordance with the EPA's approval. Within 30 days after receipt of the EPA's approval of the requested modifications pursuant to this Paragraph, Respondent shall submit to the EPA individual(s) referenced in ¶ 55 all executed and/or otherwise finalized documentation relating to the amended, reduced, or alternative financial assurance mechanism. Upon the EPA's approval, the Estimated Cost of the Work shall be deemed to be the estimate of the cost of the remaining Work in the approved proposal.

    60. **Release, Cancellation, or Discontinuation of Financial Assurance**. Respondent may release, cancel, or discontinue any financial assurance provided under this Section only: (a) after receipt of documentation issued by the EPA certifying completion of the Work; or (b) in accordance with the EPA's written approval of such release, cancellation, or discontinuation.

## XIII. INSURANCE

    61. Not later than 15 days before commencing any Work on-site under this Order, Respondent shall secure, and shall maintain until the first anniversary after the Notice of RA Completion pursuant to Section 6.0 (Reporting and Recordkeeping) of the RAWP/FDR, commercial general liability insurance with limits of one million dollars, for any one occurrence, and automobile liability insurance with limits of one million dollars, combined single limit,

naming the United States as an additional insured[s] with respect to all liability arising out of the activities performed by or on behalf of Respondent pursuant to this Order. In addition, for the duration of the Order, Respondent shall satisfy, or shall ensure that its contractors or subcontractors satisfy, all applicable laws and regulations regarding the provision of worker's compensation insurance for all persons performing Work on behalf of Respondent in furtherance of this Order. Within the same time period, Respondent shall provide the EPA with certificates of such insurance and a copy of each insurance policy. Respondent shall submit such certificate and copies of policies each year on the anniversary of the Effective Date. If Respondent demonstrates by evidence satisfactory to the EPA that any contractor or subcontractor maintains insurance equivalent to that described above, or insurance covering some or all of the same risks but in a lesser amount, then, with respect to that contractor or subcontractor, Respondent need provide only that portion of the insurance described above that is not maintained by the contractor or subcontractor.

## XIV.   DELAY IN PERFORMANCE

62.     Respondent shall notify the EPA of any delay or anticipated delay in performing any requirement of this Order. Such notification shall be made by telephone and email to the EPA Project Coordinator within 48 hours after Respondent first knew or should have known that a delay might occur. Respondent shall adopt all reasonable measures to avoid or minimize any such delay. Within seven days after notifying the EPA by telephone and email, Respondent shall provide to the EPA written notification fully describing the nature of the delay, the anticipated duration of the delay, any justification for the delay, all actions taken or to be taken to prevent or mitigate the delay or the effect of the delay, a schedule for implementation of any measures to be taken to mitigate the effect of the delay, and any reason why Respondent should not be held strictly accountable for failing to comply with any relevant requirements of this Order. Increased costs or expenses associated with implementation of the activities called for in this Order is not a justification for any delay in performance.

63.     Any delay in performance of this Order that, in the EPA's judgment, is not properly justified by Respondents under the terms of ¶ 62 shall be considered a violation of this Order. Any delay in performance of this Order shall not affect Respondent's obligations to comply with this Order.

## XV.   PAYMENT OF RESPONSE COSTS

### 64.   Response Cost Payments

a.     On a periodic basis, EPA will send Respondent a bill requiring payment of all Response Costs incurred by the United States regarding this Order that includes a cost summary. Respondent shall, within 30 days, make full payment of the amount billed, in accordance with ¶ 64.b.

b.     Respondent shall make payment by Fedwire EFT, referencing the Site/Spill ID and DJ numbers. The Fedwire EFT payment must be sent as follows:

> Federal Reserve Bank of New York
> ABA = 021030004
> Account = 68010727
> SWIFT address = FRNYUS33
> 33 Liberty Street
> New York NY 10045
> Field Tag 4200 of the Fedwire message should read
> "D 68010727 Environmental Protection Agency"

      c.    At the time of payment, Respondent shall send notice that payment has been made to the EPA representatives identified in ¶ 40, and to the EPA Cincinnati Finance Office by mail or by email at:

> EPA Cincinnati Finance Center
> 26 W. Martin Luther King Drive
> Cincinnati, Ohio 45268
> cinwd_acctsreceivable@epa.gov

Such notice shall reference Site/Spill ID Number 0818 and EPA docket number CERCLA-08-2015-0011 for this matter.

      65.    **Interest**. In the event that the payments for Response Costs are not made within 30 days after Respondent's receipt of a written demand requiring payment, Respondent shall pay Interest on the unpaid balance. The Interest on Response Costs shall begin to accrue on the date of the written demand and shall continue to accrue until the date of payment. Payments of Interest made under this Paragraph shall be in addition to such other remedies or sanctions available to the EPA by virtue of Respondent's failure to make timely payments under this Section. Respondent shall make all payments under this Paragraph in accordance with ¶ 64.b.

## XVI.   ACCESS TO INFORMATION

      66.    Respondent shall provide to the EPA, upon request, copies of all records, reports, documents, and other information (including records, reports, documents, and other information in electronic form) (hereinafter referred to as "Records") within Respondent's possession or control or that of its contractors or agents relating to activities at the Site or to the implementation of this Order, including, but not limited to, sampling, analysis, chain of custody records, manifests, trucking logs, receipts, reports, sample traffic routing, correspondence, or other documents or information regarding the Work. Respondent shall also make available to the EPA, for purposes of investigation, information gathering, or testimony, its employees, agents, or representatives with knowledge of relevant facts concerning the performance of the Work.

      67.    **Privileged and Protected Claims**.

      a.    Respondent may assert that all or part of a Record requested by the EPA is privileged or protected as provided under federal law, in lieu of providing the Record, provided Respondent complies with ¶ 67.b, and except as provided in ¶ 67.c.

18

      b.     If Respondent asserts a claim of privilege or protection, it shall provide the EPA with the following information regarding such Record: its title; its date; the name, title, affiliation (e.g., company or firm), and address of the author, of each addressee, and of each recipient; a description of the Record's contents; and the privilege or protection asserted. If a claim of privilege or protection applies only to a portion of a Record, Respondent shall provide the Record to the EPA in redacted form to mask the privileged or protected portion only. Respondent shall retain all Records that they claim to be privileged or protected until the EPA has had a reasonable opportunity to dispute the privilege or protection claim and any such dispute has been resolved in the Respondent's favor.

      c.     Respondent may make no claim of privilege or protection regarding: (1) any data regarding the Site, including, but not limited to, all sampling, analytical, monitoring, hydrogeologic, scientific, chemical, radiological, or engineering data, or the portion of any other Record that evidences conditions at or around the Site; or (2) the portion of any Record that Respondent are required to create or generate pursuant to this Order.

    68.    **Business Confidential Claims**. Respondent may assert that all or part of a Record provided to the EPA under this Section or Section XVII (Record Retention) is business confidential to the extent permitted by and in accordance with section 104(e)(7) of CERCLA, 42 U.S.C. § 9604(e)(7), and 40 C.F.R. § 2.203(b). Respondent shall segregate and clearly identify all Records or parts thereof submitted under this Order for which Respondent assert business confidentiality claims. Records submitted to the EPA determined to be confidential by the EPA will be afforded the protection specified in 40 C.F.R. Part 2, Subpart B. If no claim of confidentially accompanies Records when they are submitted to the EPA, or if the EPA has notified Respondent that the Records are not confidential under the standards of CERCLA section 104(e)(7) or 40 C.F.R. Part 2, Subpart B, the public may be given access to such Records without further notice to Respondent.

## XVII. RECORD RETENTION

    69.    During the pendency of this Order and for a minimum of 10 years after the EPA provides Notice of Work Completion under Sections 5.5 (Landowner Communication) and 6.0 (Reporting and Recordkeeping) of the RAWP/FDR, Respondent shall preserve and retain all non-identical copies of Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to its liability under CERCLA with respect to the Site, provided, however, that Respondent must retain, in addition, all Records that relate to the liability of any other person under CERCLA with respect to the Site. Respondent must also retain, and instruct its contractors and agents to preserve, for the same period of time specified above, all non-identical copies of the last draft or final version of any Records (including Records in electronic form) now in its possession or control or that come into its possession or control that relate in any manner to the performance of the Work, provided, however, that Respondent (and its contractor and agents) must retain, in addition, copies of all data generated during performance of the Work and not contained in the aforementioned Records to be retained. Each of the above record retention requirements shall apply regardless of any corporate retention policy to the contrary.

70.     At the conclusion of this document retention period, Respondent shall notify the EPA and the State at least 90 days prior to the destruction of any such Records, and, upon request by the EPA or the State, and except as provided in ¶ 67, Respondent shall deliver any such Records to the EPA or the State.

71.     Within 30 days after the Effective Date, Respondent shall submit a written certification to EPA's Project Coordinator [RPM] that, to the best of its knowledge and belief, after thorough inquiry, it has not altered, mutilated, discarded, destroyed, or otherwise disposed of any Records (other than identical copies) relating to its potential liability regarding the Site since notification of potential liability by the United States or the State and that it has fully complied with any and all EPA requests for information regarding the Site pursuant to sections 104(e) and 122(e) of CERCLA, 42 U.S.C. §§ 9604(e) and 9622(e), and section 3007 of RCRA, 42 U.S.C. § 6927, and state law. If Respondent unable to so certify, it shall submit a modified certification that explains in detail why it is unable to certify in full with regard to all Records.

## XVIII. ENFORCEMENT/WORK TAKEOVER

72.     Any willful violation, or failure or refusal to comply with any provision of this Order may subject Respondent to civil penalties of up to $37,500 per violation per day, as provided in section 106(b)(1) of CERCLA, 42 U.S.C. § 9606(b)(1), and the Civil Monetary Penalty Inflation Adjustment Rule, 69 Fed. Reg. 7121, 40 C.F.R Part 19.4. In the event of such willful violation, or failure or refusal to comply, the EPA may carry out the required actions unilaterally, pursuant to section 104 of CERCLA, 42 U.S.C. § 9604, and/or may seek judicial enforcement of this Order pursuant to section 106 of CERCLA, 42 U.S.C § 9606. In addition, nothing in this Order shall limit the EPA's authority under Section XII (Financial Assurance). Respondent may also be subject to punitive damages in an amount up to three times the amount of any cost incurred by the United States as a result of such failure to comply, as provided in section 107(c)(3) of CERCLA, 42 U.S.C. § 9607(c)(3).

## XIX.   RESERVATIONS OF RIGHTS

73.     Nothing in this Order limits the rights and authorities of the EPA and the United States:

        a.     To take, direct, or order all actions necessary, including to seek a court order, to protect public health, welfare, or the environment or to respond to an actual or threatened release of Waste Material on, at, or from the Site;

        b.     To select further response actions for the Site in accordance with CERCLA and the NCP;

        c.     To seek legal or equitable relief to enforce the terms of this Order;

        d.     To take other legal or equitable action as they deem appropriate and necessary, or to require Respondent in the future to perform additional activities pursuant to CERCLA or any other applicable law;

e.      To bring an action against Respondent under section 107 of CERCLA, 42 U.S.C.§ 9607, for recovery of any costs incurred by the EPA or the United States regarding this Order or the Site;

f.      Regarding access to, and to require Institutional Controls regarding, the Site under CERCLA, RCRA or other applicable statutes and regulations; or

g.      To obtain information and perform inspections in accordance with CERCLA, RCRA, and any other applicable statutes or regulations.

## XX.     OTHER CLAIMS

74.     By issuance of this Order, the United States and the EPA assume no liability for injuries or damages to persons or property resulting from any acts or omissions of Respondent. The United States or the EPA shall not be deemed a party to any contract entered into by Respondent or its directors, officers, employees, agents, successors, representatives, assigns, contractors, or consultants in carrying out actions pursuant to this Order.

75.     Nothing in this Order constitutes a satisfaction of or release from any claim or cause of action against Respondent or any person not a party to this Order, for any liability such person may have under CERCLA, other statutes, or common law, including but not limited to any claims of the United States under sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607.

76.     Nothing in this Order shall be deemed to constitute preauthorization of a claim within the meaning of section 111 of CERCLA, 42 U.S.C. § 9611, or 40 C.F.R. § 300.700(d).

77.     No action or decision by the EPA pursuant to this Order shall give rise to any right to judicial review, except as set forth in section 113(h) of CERCLA, 42 U.S.C. § 9613(h).

## XXI.    ADMINISTRATIVE RECORD

78.     The EPA has established an administrative record that contains the documents that form the basis for the issuance of this Order, including, but not limited to, the documents upon which the EPA based the selection of the Remedial Actions selected in the ROD. Copies of the documents in the administrative record may be obtained by contacting Andrew J. Lensink as provided at ¶ 38.

## XXII.   DOCUMENTS INCORPORATED BY REFERENCE

79.     The following documents are incorporated by reference into this Order:
"Reference A" is the ROD;
"Reference B" is the ROD Amendment;
"Reference C" is the RAWP/FDR;
"Reference D" is the letter approving the RAWP/FDR; and
"Reference E" is the Index of the Administrative Record.

21

## XXIII. SEVERABILITY

80.     If a court issues an order that invalidates any provision of this Order or finds that Respondent has sufficient cause not to comply with one or more provisions of this Order, Respondent shall remain bound to comply with all provisions of this Order not invalidated or determined to be subject to a sufficient cause defense by the court's order.

It is so ORDERED.

BY: _____          DATE: _9/24/15_
        Martin Hestmark
        Assistant Regional Administrator
        Office of Ecosystems Protection and Remediation
        U.S. Environmental Protection Agency, Region 8

**EXHIBIT B**

Tom. L. Lewis
J. David Slovak
Mark M. Kovacich
LEWIS, SLOVAK, KOVACICH & MARR, P.C.
P.O. Box 2325
Great Falls, MT 59403
(406) 761-5595

Monte D. Beck
Justin P. Stalpes
Lindsay C. Beck
BECK & AMSDEN, PLLC
1946 Stadium Drive, Suite 1
Bozeman, MT 59715
(406) 586-8700

Attorneys for Plaintiffs

MONTANA SECOND JUDICIAL DISTRICT COURT, SILVER BOW COUNTY

| | |
|---|---|
| GREGORY A. CHRISTIAN; MICHELLE D. ) | CAUSE NO. DV-08-173 BN |
| CHRISTIAN; ROSEMARY CHOQUETTE; ) | |
| DUANE N. COLWELL; SHIRLEY A. ) | |
| COLWELL; FRANKLIN J. COONEY; VICKI ) | |
| COONEY; GEORGE COWARD; SHIRLEY ) | |
| COWARD; JACK E. DATRES; SHEILA ) | |
| DORSCHER; VIOLA DUFFY; BRUCE ) | |
| DUXBURY; JOYCE DUXBURY; BILL ) | |
| FIELD; CHRIS FIELD; ANDREW GRESS ) | |
| AND FRANK GRESS AS CO-PERSONAL ) | |
| REPRESENTATIVES OF THE ESTATE ) | |
| OF JAMES GRESS; CHARLES ) | **THIRD AMENDED COMPLAINT** |
| GUSTAFSON; MICHAEL  HENDRICKSON;) | **AND JURY DEMAND** |
| BRUCE HOLBROOK; MAUREEN ) | |
| ROBINSON-HOLBROOK; PATRICE ) | |
| HOOLAHAN; SHAUN HOOLAHAN; ED ) | |
| JONES; RUTH JONES; BARBARA ) | |
| KELSEY; CARL KOEPPLIN; MYRTLE ) | |
| KOEPPLIN; BRENDA KRATTIGER; ) | |
| DOUG KRATTIGER; LADONA KRUM; ) | |
| JULIE LATRAY; LEONARD MANN; ) | |
| VALERIE MANN; KRISTY MCKAY; RUSS ) | |
| MCKAY; BRYCE MEYER; MILDRED ) | |
| MEYER; JUDY  MINNEHAN; TED ) | |
| MINNEHAN; DIANE MORSE; RICHARD ) | |
| MORSE; KAREN MULCAHY; PATRICK ) | |
| MULCAHY; NANCY MYERS; SERGE ) | |
| MYERS; LESLIE NELSON; RON ) | |

NELSON; JANE NEWELL; JOHN            )
NEWELL; GEORGE NILAND; LAURIE        )
NILAND; DAVID OSTROM; ROSE ANN       )
OSTROM; JUDY PETERS; TAMMY           )
PETERS; ROBERT PHILLIPS; TONI        )
PHILLIPS; CAROL POWERS; WILLIAM D. )
POWERS; GARY RAASAKKA; MALISSA       )
RAASAKKA; ALEX REID; KENT            )
REISENAUER; PETE REISENAUER; SUE )
REISENAUER; LARRY RUPP; JOHN A.      )
RUSINSKI; KATHRYN RUSINSKI; EMILY )
RUSS; SCOTT RUSS; CARL RYAN;         )
PENNY RYAN; RICH SALLE; DIANE        )
SALLE; DALE SCHAFER; DAVID D.        )
SCHLOSSER; ILONA M. SCHLOSSER;       )
MICHAEL SEVALSTAD; JIM SHAFFORD; )
ROSEMARIE SILZLY; ANTHONY SOLAN; )
KEVIN SORUM; DON SPARKS; VICKIE      )
SPEHAR; ZANE SPEHAR; CARA            )
SVENDSEN; CARON SVENDSEN;            )
JAMES H. SVENDSEN, SR.; JAMES        )
SVENDSEN, JR.; DOUG VIOLETTE;        )
ESTER VIOLETTE;  CAROL WALROD;       )
CHARLES WALROD; DARLENE WILLEY; )
KEN YATES; SHARON YATES; LINDA       )
EGGEN AS PERSONAL                    )
REPRESENTATIVE OF THE ESTATE OF )
WILLIAM YELSA AND AS GUARDIAN OF )
MAURINE YELSA; DAVID ZIMMER; and )
TONI ZIMMER,                         )
                                     )
                    Plaintiffs,      )
                                     )
        vs.                          )
                                     )
BP AMOCO CORPORATION, a Foreign      )
Corporation for Profit; BP CORPORATION )
NORTH AMERICA, INC., a Foreign for   )
Profit Corporation; BP AMERICA, INC., a )
Foreign Corporation for Profit;; BP Amoco )
CHEMICAL COMPANY, a Corporation;     )
BP Amoco, P.L.C., a Corporation; THE )
BRITISH PETROLEUM COMPANY,           )
P.L.C., a Foreign Corporation for Profit; )
ATLANTIC RICHFIELD COMPANY, a        )
Corporation for Profit; ATLANTIC     )
RICHFIELD DELAWARE CORPORATION, )
a Delaware Corporation for Profit; THE )
ANACONDA DELAWARE                    )

CORPORATION, a for Profit Corporation;  )
THE ANACONDA COMPANY, a Montana  )
Corporation; ANACONDA MINERALS  )
COMPANY, a Corporation; ANACONDA  )
COPPER MINING COMPANY; a For Profit  )
Corporation; ESTATE OF FRANK DAY,  )
Deceased; SHANNON DUNLAP; and  )
DOES I - 100, Inclusive;  )
                               )
             Defendants.  )

_____

COME NOW the Plaintiffs, demanding trial by jury, and for their complaint against the Defendants, allege as follows:

## PARTIES

### 1.

All Plaintiffs, except LaDona Krum and Anthony Solan, are citizens of the State of Montana. Plaintiff LaDona Krum is a citizen of Nevada. Plaintiff Anthony Solan is a citizen of Washington. One or more of the Plaintiffs is a resident of Silver Bow County. Plaintiffs own real property in and around Opportunity, Montana.

### 2.

Defendant The Anaconda Company is and/or was a business corporation for profit with its principal place of business in the State of Montana.

### 3.

Defendants Atlantic Richfield Company (ARCO), Atlantic Richfield Delaware Corporation, and The Anaconda Delaware Corporation are business corporations for profit organized and existing under the laws of states other than the State of Montana with principal places of business in states unknown to the Plaintiff. Defendants ARCO; Atlantic Richfield Delaware Corporation; and Anaconda Delaware Corporation were involved in merger agreements, which ultimately resulted in the purchase and/or acquisition of

Defendant The Anaconda Company by ARCO. As a result of the said merger agreements and the acquisition of The Anaconda Company, ARCO, Atlantic Richfield Delaware Corporation, and Anaconda Delaware Corporation assumed liability for all claims that could have been brought against The Anaconda Company. For purposes of this action, the allegations and claims against The Anaconda Company are also allegations and claims against ARCO, Atlantic Richfield Delaware Corporation, and Anaconda Delaware Corporation, as successor corporations. (The Anaconda Company, ARCO, Atlantic Richfield Delaware Corporation, and Anaconda Delaware Corporation may be referred to from time to time herein as the "ARCO Defendants.")

4.

Defendants BP Amoco Corporation: BP Corporation North America, Inc.; BP America, Inc.; BP Amoco Chemical Company; BP Amoco, P.L.C.; The British Petroleum Company, P.L.C.; and one or more of Does 1 - 1000 Inc. are business corporations for profit organized and existing under the laws of states other than the State of Montana with principal places of business in States unknown to the Plaintiff (BP Amoco Corporation; BP Corporation North America, Inc.; BP America, Inc.; BP Amoco Chemical Company; BP Amoco, P.L.C.; The British Petroleum Company, PL.C.; and one or more of Does 1 - 1000 Inc. may be referred to from time to time herein as the "BP Amoco Defendants.") The BP Amoco Defendants were involved in merger agreements, which ultimately resulted in the purchase and/or acquisition of the ARCO Defendants. As a result of the merger agreement and acquisition of the ARCO Defendants, the BP Amoco Defendants assumed liability for all claims which could have been brought against the ARCO Defendants and The Anaconda Company. For purposes of this action, the allegations and claims against

the ARCO Defendants and The Anaconda Company are also allegations and claims against the BP Amoco Defendants, as successor corporations.

5.

Defendant the Estate of Frank Day is a citizen and resident of the State of Montana. On the date of his death Frank Day was a citizen and resident of the State of Montana. This action is brought against the Estate of Frank Day for personal torts of Frank Day committed in his individual capacity against the Plaintiffs and in his capacity as manager of The Anaconda Company smelter in Anaconda, Montana.

6.

Defendant Shannon Dunlap is a citizen and resident of Butte, Silver Bow County, Montana. Dunlap is an employee of ARCO. This action is brought against Dunlap for personal torts committed in his individual capacity against the Plaintiffs.

7.

The true names and capacities of Defendants named herein as Does I through 100, inclusive, are unknown to Plaintiffs at this time. Plaintiffs therefore bring this action against Does I through 100, inclusive, by such fictitious names. Plaintiffs will seek leave to amend this complaint to state the true names and capacities of Does 1 through 100 when the same have been ascertained, together with further appropriate charging allegations. Plaintiffs are informed, believe, and thereon allege that each Defendant, fictitiously named Does 1 through 100, is legally responsible for the occurrences herein alleged and that Plaintiffs' damages were proximately caused by each fictitiously named Defendant's unlawful acts or omissions. Defendants Does 1 through 100, inclusive, are natural persons, corporations, partnerships, joint ventures, or other legal entities who wrongfully and unlawfully caused or contributed to Plaintiffs' damages.

## JURISDICTION AND VENUE

### 8.

The District Court has jurisdiction pursuant to § 3-5-302, MCA.

### 9.

Venue is proper in the Montana Second Judicial District Court, Silver Bow County, Montana, pursuant to § 25-2-117, § 25-2-118, and § 25-2-122, MCA, because Defendant Dunlap is a resident of Silver Bow County, and because the Defendants committed acts resulting in the accrual of this tort action in Silver Bow County.

## GENERAL ALLEGATIONS

### 10.

Each act of negligence, carelessness, recklessness, and maliciousness, and each violation of law alleged herein was committed by Defendants and/or employees or agents of Defendants, acting within the course and scope of their employment or agency with Defendants, and in furtherance of the business interests of Defendants; and each unlawful act or omission alleged herein is imputable to Defendants.

### 11.

ARCO and its predecessors, acting in the course and scope of their businesses, owned, occupied, operated, managed, used, and/or maintained a milling and smelting operation located near the towns of Anaconda and Opportunity, Deer Lodge County, Montana. This operation and its associated ore processing and smelting facilities were developed to remove copper from ore mined in Butte, Silver Bow County, from 1884 to 1980.

12.

During the period of their ownership and occupancy of the mining, milling, and smelting operation and its associated facilities, and at times since closing the operation, Defendants negligently, suddenly, accidentally, unexpectedly, maliciously, and with reckless disregard of Plaintiffs' rights, caused toxic and hazardous smelter and ore processing wastes - including, but not limited to, mine tailings, furnace slag, flue dust, and heavy metals such as arsenic, copper, cadmium, lead, and zinc - to enter the air, soil, surface waters, and groundwater in and around said facilities.

13.

Said toxic contaminants and hazardous materials migrated, and continue to migrate, by means of air, groundwater, and soil, onto the property of the Plaintiffs.

14.

Defendants intentionally, negligently, maliciously, and/or with reckless disregard of Plaintiffs' rights, made affirmative misrepresentations and/or failed to disclose material facts to Plaintiffs, and/or prior owners of Plaintiffs' property. Defendants were aware of the toxicity and migration of said hazardous materials, knew the hazards associated with the migration of such toxic materials into the community, and failed to warn Plaintiffs, or prior owners of Plaintiffs' property, that their health, welfare, and property values had been jeopardized.

15.

As a direct and proximate result of the Defendants' unlawful conduct, Plaintiffs have suffered damages, including, but are not limited to, loss of real property value, damage to their interests in real property, costs of investigation and restoration of real property, loss of use and enjoyment of property, and incidental and consequential damages.

THIRD AMENDED COMPLAINT AND JURY DEMAND - 7

## FIRST CAUSE OF ACTION

### (Negligence)

Plaintiffs reallege paragraphs 1 through 15 of this Complaint and Jury Demand and adopt the same as paragraphs 1 through 15 of this First Cause of Action.

16.

Defendants owed Plaintiffs a duty to act with reasonable care, so as not to jeopardize their property, health, and welfare.

17.

Defendants breached their duty of care by negligently, carelessly, and recklessly generating, releasing, depositing, disposing, and failing to control and contain the hazardous and toxic materials generated, used, and released at their Anaconda mining, milling, and smelting operation and its associated facilities.  Defendants' negligence is more particularly described as follows:

A.   Failure to control and contain heavy metals and other toxic substances generated and spread as a result of Defendants' operations;

B.   Failure to prevent said toxic materials from migrating to neighboring properties;

C.   Failure to exercise reasonable care to contain the toxins once the Defendants knew or reasonably should have known they had polluted a large area in and about the Plaintiffs' properties;

D.   Failure to exercise reasonable care to prevent the escape of Defendants' toxins that permeated the soil and contaminated the groundwater in and

about the area of Plaintiffs' properties thereby creating a substantial risk of harm and injury to Plaintiffs and their properties;

E.     Failure to remove the toxic substances from the Plaintiffs' properties; and

F.     Failure to warn the Plaintiffs of the scope of and dangers posed by the contamination.

18.

As a direct and proximate result of the Defendants' foregoing negligent and unlawful conduct, Plaintiffs have suffered, and continue to suffer, damages and detriment as herein alleged.

## SECOND CAUSE OF ACTION

### (Public Nuisance)

Plaintiffs reallege paragraphs 1 through 18 of the First Cause of Action and adopt the same as paragraphs 1 through 18 of this Second Cause of Action.

19.

The Plaintiffs are members of the public who reside, work, conduct their personal and business affairs, and have proprietary interests in certain real and personal property in the areas affected by Defendants' contamination. Plaintiffs also have rights incidental to that property, including the right to the exclusive use and quiet enjoyment of the property.

20.

The conduct of Defendants violates § 27-30-101, MCA, *et seq.*, and constitutes a common law nuisance in that it is specially injurious and offensive to the senses of the Plaintiffs, specially interferes with and disturbs their comfortable enjoyment of their life and property, and unlawfully prevents the customary use of their property and residences. The

contamination caused by Defendants' activities, as herein described, affects a considerable number of persons, including the entire community surrounding Plaintiffs' property.

21.

To the extent the nuisance is not also a private nuisance, the nuisance is specially injurious to Plaintiffs in that they are members of the public who reside or own property within the area immediately affected by the pollution. Plaintiffs therefore have suffered interference with and injury to the use and enjoyment of their property which is different in kind from the injury suffered by the general public.

22.

Unless the nuisance is abated, Plaintiffs' property and rights of enjoyment of their property will be progressively further damaged and further jeopardized in the future.

23.

As a direct and proximate result of the public nuisance alleged herein, Plaintiffs have suffered, and continue to suffer damages and detriment as herein alleged.

### THIRD CAUSE OF ACTION

### (Private Nuisance)

Plaintiffs reallege paragraphs 1 through 23 of the Second Cause of Action and adopt the same as paragraphs 1 through 23 of this Third Cause of Action.

24.

Plaintiffs have ownership and/or proprietary interests in certain real and personal property in the areas affected by the Defendants' toxic contamination released into the soil, air, and water. Plaintiffs also have the right to the exclusive use and quiet enjoyment of their property.

25.

The conduct of the Defendants constitutes a private nuisance in that such conduct has caused substantial injury to and interference with the comfortable enjoyment and use by Plaintiffs of their real and personal property, and their rights to use their property and residences in the customary manner without exposure to or concern regarding the dangers of toxic substances.

26.

Unless the nuisance is abated, Plaintiffs' property and their right to use and enjoy their property and their interests will be progressively further jeopardized.

27.

As a direct and proximate result of the private nuisance created by Defendants's unlawful conduct and activities, and the toxic dumping that resulted therefrom, Plaintiffs have suffered, and continue to suffer damages and detriment as herein alleged.

## FOURTH CAUSE OF ACTION

### (Trespass)

Plaintiffs reallege paragraphs 1 through 27 of the Third Cause of Action and adopt the same as paragraphs 1 through 27 of this Fourth Cause of Action.

28.

At all times relevant to the causes of action alleged in this Complaint, Plaintiffs resided on, owned, and/or lawfully possessed property within the area affected by the contamination.

29.

The Defendants intentionally, recklessly, negligently, without just cause and by conducting an abnormally dangerous activity, committed the wrongful act of trespass by

causing heavy metals, including arsenic, copper, cadmium, lead, and zinc, and other toxic contaminants and hazardous substances, including mine tailings, furnace slag, and flue dust, to invade and to remain on the real property of Plaintiffs. Said toxic substances were transported on to Plaintiffs' properties by air, soil, and groundwater.

30.

Defendants have failed to remove said toxic substances from the property.

31.

As a direct and proximate result of Defendants' trespass, Plaintiffs have suffered, and continue to suffer damage and loss to their real property as herein alleged.

## FIFTH CAUSE OF ACTION

### (Strict Liability for Abnormally Dangerous Activity)

Plaintiffs reallege paragraphs 1 through 31 of the Fourth Cause of Action and adopt the same as paragraphs I through 31 of this Fifth Cause of Action.

32.

The mining, milling, smelting, use, disposal, and release of large quantities and concentrations of heavy metals and other hazardous substances as herein alleged and the operation of a large scale mining, milling, and smelting operation immediately adjacent to a residential community is an abnormally dangerous and ultra hazardous activity in that:

A.    There exists a high degree of risk of serious harm to the environment, persons, land, chattels of others, including Plaintiffs, which cannot be eliminated by the exercise of reasonable care;

B.    There is a strong likelihood that great harm will result from the mining, milling, smelting, use, disposal, and release of such hazardous materials and toxic substances;

C.    The mining, milling, smelting, use, disposal, and release of such hazardous materials and toxic substances in large quantities and concentrations in close proximity to a residential community is not a matter of common usage such as would be carried on by the great mass of mankind or many people in the community;

D.    The manner in which Defendants mined, milled, smelted, used, disposed, and released such materials at their facilities is and was inappropriate; and

E.    The value to Defendants of the mining, milling, smelting, use, disposal, and release of such large quantities and concentrations of hazardous materials and toxic substances adjacent to a residential community is outweighed by the likelihood of harm resulting therefrom.

33.

As a direct and proximate result of Defendants' unlawful actions and abnormally dangerous and ultra hazardous activities, Plaintiffs have suffered, and continue to suffer, damages and detriment as herein alleged.

## SIXTH CAUSE OF ACTION

### (Constructive Fraud)

Plaintiffs reallege paragraphs 1 through 33 of the Fifth Cause of Action and adopt the same as paragraphs 1 through 33 of this Sixth Cause of Action.

34.

Defendants, including Defendant Dunlap and including Defendant The Estate of Frank Day, by and through its decedent Frank Day, have known for decades that their conduct as herein alleged caused toxic substances and hazardous materials to enter the air, soil and groundwater and, as such, invade and remain on Plaintiffs' real property.

THIRD AMENDED COMPLAINT AND JURY DEMAND - 13

35.

Defendants, and each of them, had, and continue to have, an absolute duty to disclose fully and to warn Plaintiffs, on an ongoing basis, of the nature of, type of, extent of, scope of contamination and the risks posed by the toxic substances and hazardous materials released by the Defendants' mining, milling, and smelting operation and its associated facilities.

36.

Defendants breached, and continue to breach, their duties, as set forth in the preceding paragraph, and further, have misrepresented and continue to misrepresent, downplay, and conceal material facts, thereby gaining an unfair advantage, by deception, over Plaintiffs to their prejudice, all in violation of § 28-2-406, MCA, and the common law of Montana.

37.

As a result of Defendants' constructively fraudulent and deceitful acts, Plaintiffs' interests were compromised because they relied upon the misinformation of Defendants' to their detriment and suffered damages, and continue to suffer damages and detriment as herein alleged.

## SEVENTH CAUSE OF ACTION

### (Unjust Enrichment)

Plaintiffs reallege paragraphs 1 through 37 of the Sixth Cause of Action and adopt the same as paragraphs 1 through 37 of this Seventh Cause of Action.

38.

The Defendants intentionally, negligently, unlawfully, and wrongfully disposed of and deposited toxic substances onto the Plaintiffs' properties.  Despite knowledge that the

THIRD AMENDED COMPLAINT AND JURY DEMAND - 14

Defendants had contaminated the Plaintiffs' properties, the Defendants have failed and refused to timely and properly remove the contamination.

39.

The Defendants' use of Plaintiffs' property to dispose of, deposit, and store toxic substances is wrongful and unlawful. Plaintiffs did not consent to the use of their property in that manner.

40.

The Defendants' unauthorized use of Plaintiffs' property has benefitted them monetarily to the Plaintiffs' detriment. The Defendants are therefore unjustly enriched, and Plaintiffs are entitled to damages as a result of the Defendants' unjust enrichment.

**SEVENTH CAUSE OF ACTION**

**(Wrongful Occupation of Real Property)**

Plaintiffs reallege paragraphs 1 through 40 of the Seventh Cause of Action and adopt the same as paragraphs 1 through 40 of this Eighth Cause of Action.

41.

Defendants have wrongfully occupied and continue to wrongfully occupy Plaintiffs' private property in violation of § 27-1-318, MCA, and Montana common law.

42.

As a result of Defendants' wrongful occupation of Plaintiffs' property, Plaintiffs have suffered, and continue to suffer damages and detriment as herein alleged.

## DAMAGES

43.

As a direct and proximate result of Defendants' wrongful and unlawful acts and omissions, as herein alleged, Plaintiffs were injured, have suffered, continue to suffer, and/or are reasonably certain to suffer, the following harm, detriment, and damages:

A.    Injury to and loss of use and enjoyment of real and personal property:

B.    Loss of the value of real property and rights incidental thereto, and loss of use of that value and those rights:

C.    Incidental and consequential damages, including relocation expenses and loss of rental income and/or value:

D.    Annoyance, inconvenience and discomfort over the loss and prospective loss of property value, economic opportunities, ways of life and other legal rights: and

E.    Expenses for and cost of investigation and restoration of real property:

44.

The Montana Constitution guarantees all persons in Montana the inalienable, fundamental right to acquire, possess, and protect property, as well as the right to a clean and healthful environment. Defendants' conduct has violated the Plaintiffs' constitutional rights, and Plaintiffs are entitled to damages for full restoration of their property as necessary to protect these constitutional rights.

45.

The Defendants have been unjustly enriched. Plaintiffs are entitled to damages as a result of the Defendants' unjust enrichment.

46.

Plaintiffs are entitled to damages for Defendants' wrongful occupation of the Plaintiffs' properties.

47.

Plaintiffs have suffered and continue to suffer actual damages as a result of Defendants' unlawful conduct.

48.

Although Defendants have known for many years that their unlawful conduct has caused, and continues to cause, actual and extensive harm to Plaintiffs and their property interests, Defendants have deliberately proceeded to act in conscious and intentional disregard for and indifference to the harm and the high probability of further injury and harm to Plaintiffs. The conduct of Defendants' is so intentional, fraudulent, malicious, and egregious so as to shock the conscience and present an affront to societal interests that are unfathomable.  Defendants have acted with cold and calculated indifference to the rights and interests of the Plaintiffs and their community.

49.

Defendants have made misrepresentations of fact with knowledge or their falsity and have concealed material facts with the purpose of depriving Plaintiffs of their property or legal rights and otherwise causing them injury, harm, and damages.

50.

Defendants were, and are, guilty of intentional misconduct, actual malice, which justifies imposition of punitive or exemplary damages in a sufficient amount to punish them and to serve as warning to other legal entities similarly situated that such conduct is unacceptable in our society and will not be tolerated.

**JURY DEMAND**

Plaintiffs demand trial by jury.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment against the Defendants and awarding damages for following:

1.      Reasonable compensation to Plaintiffs for all harm they have suffered as a result of Defendants' unlawful conduct;

2.      Damages for investigation and restoration of Plaintiffs' property and other contaminated property in close proximity to Plaintiffs' property in order to remove present contamination and prevent future contamination;

3.      Reasonable compensation for loss of property value;

4.      Reasonable compensation for loss of use and enjoyment of real property;

5.      Damages for the value of Defendants' unauthorized use and wrongful occupation of Plaintiffs' property, as well as the costs necessary to Plaintiffs to recover possession of their property, including all necessary investigation and restoration costs;

6.      Reasonable compensation for unjust enrichment;

7.      Reasonable compensation for annoyance, inconvenience, and discomfort over the loss and prospective loss of property value, economic opportunities, and other legal rights;

8.      Punitive and exemplary damages in an amount sufficient to punish and to deter Defendants and others similarly situated from engaging in similar wrongdoing;

9.      Incidental and consequential damages, including relocation expenses and loss of rental income and value;

10.     Costs and disbursements incurred herein; and

**THIRD AMENDED COMPLAINT AND JURY DEMAND - 18**

11.   Such other and further relief as the Court deems just and equitable.

DATED this ___21___ day of December, 2012.

LEWIS, SLOVAK, KOVACICH & MARR, P.C.
and
BECK & AMSDEN, PLLC

By:_____
Mark M. Kovacich
P.O. Box 2325
Great Falls, MT  59403
Attorneys for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that, on the 21st day of December, 2012, I served by first class

mail, postage prepaid, a true and legible copy of the foregoing **Third Amended Complaint**

**and Jury Demand** upon the following:

John P. Davis
POORE, ROTH & ROBINSON, P.C.
P.O. Box 2000
Butte, MT  59702

Michael J. Gallagher
Shannon Wells Stevenson
Jonathan W. Rauchway
Emily L. Droll
Mark Champoux
DAVIS, GRAHAM & STUBBS, LLP
1550 17th Street, Suite 500
Denver, CO  80202

Monte D. Beck
Justin P. Stalpes
Lindsay C. Beck
BECK & AMSDEN, PLLC
1946 Stadium Drive, Suite 1
Bozeman, MT 59715
(Co-Attorneys for Plaintiffs)